MASONETTA M. WARING et al.

vs.

FRANK M. STINCHCOMB et al.

*Accretion to Land—Injunction Against Trespass—Removal of Fence.*

Where a formation by accretion, beginning on the land of one riparian proprietor, gradually extends in front of the land of another, the latter is entitled to that part which forms in front of his land.                                                      p. 582

That a formation by accretion in front of one's land is separated therefrom by a narrow stream does not affect his right to such formation.                                                pp. 581, 582

Equity will interfere by injunction to restrain a trespass, where the injury is irreparable, where full and adequate relief cannot be granted at law, where the trespass goes to the destruction of the property as it has been held and enjoyed, or to prevent a multiplicity of suits.                                    p. 583

Where a fence served to locate the former course of a stream, as it existed before a substantial change therein occurred, and such former course was an important element in establishing the line between the lands of plaintiff and defendant, *held* that plaintiff was entitled to an injunction to restrain the destruction of the fence.                                                 p. 583

When there is a prayer for special relief and also one for general relief, the court may, if it refuses special relief, grant any other appropriate relief under the general prayer, but the relief must conform to the case made out by the pleading as well as by the proof, and the relief granted under such general prayer must not be repugnant to or inconsistent with the specific prayer and must be warranted by the allegations of the bill.                                                              p. 584

*Decided July 18th, 1922.*

Appeal from the Circuit Court for Anne Arundel County, In Equity (Moss, J.).

Bill by Frank M. Stinchcomb and Sarah A. Stinchcomb against Masonetta M. Waring and J. Everett Waring, her husband. From a decree for plaintiffs, defendants appeal. Reversed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*A. Theo. Brady* and *Ridgely P. Melvin,* for the appellants.

An injunction will not be granted to restrain a mere trespass where the injury is not irreparable and destructive to the plaintiff's estate, but is susceptible of pecuniary compensation in the ordinary course of law. *Herr* v. *Bierbower,* 3 Md. Ch. 456; *Salmon* v. *Clagett,* 3 Bland, 125; *Amelung* v. *Seekamp,* 9 G. & J. 468, Brantly's ed. note a; *Pfelz* v. *Pfelz,* 14 Md. 377; *Bernei* v. *Sappington,* 102 Md. 185; *Main* v. *Hagerstown,* 132 Md. 340.

In cases where the legal title to the property is in dispute, and it appears by the pleadings and proof that serious loss or injury will result, or is likely to result to the plaintiff before the disputed title could be established at law, the court will grant a temporary injunction preserving the present status, until the title has been decided in a court of law. *Lanahan* v. *Graham,* 37 Md. 106; *Amelung* v. *Seekamp,* 9 G. & J. 467; *Bernei* v. *Sappington,* 102 Md. 191. It is, therefore, respectfully submitted that a court of law is the only tribunal in which it is possible to determine the rights of the parties as to the strip of land in question.

As this point of land, or the *locus in quo,* is seen today from an ocular investigation, and in all the evidence adduced in this case, it is an alluvial formation attached and made fast to "Pettibone's Rest," or the property of the appellants,

separated from the land of the appellees by the outlet of Little
Magothy River, or Creek, and no part of it is at any point
attached to the land of the appellees.

*William L. Marbury* and *Nicholas H. Green,* for the ap-
pellees.

Where a river changes its course so as to cut off a point
of the property of a landowner, this will not change the owner-
ship, the title to the island thus formed will still be in the
original owner. *Hopkins Academy* v. *Dickinson,* 9 Cush.
(Mass.) 144; *Bonewitz* v. *Wygant,* 75 Ind. 41.

"Where alluvion begins to form upon the land of one of
two contiguous riparian proprietors and gradually extends in
front of the land of the other, the proprietor of the land on
which the alluvion first commences is entitled to only that
alluvion which lies in front of his own land." *Crandall* v.
*Allen,* 118 Mo. 403.

"Where accretion was begun by deposit against the shore
of the main land (as here the original beach was formed by
deposits of sand along the plaintiffs' shore) the subsequent
existence of an intermediate stream between the main land
and accretion will not prevent accretion from belonging to the
owner of the main land." *Dowl* v. *Wheeler,* 76 Ark. 529;
*Stoner* v. *Rayer,* 200 Mo. 444.

But even if no part of the land upon which the accretion
accumulated had ever belonged to the plaintiffs, the fact that
the accretion began out in the channel instead of starting
from plaintiffs' land would not have made it any the less
plaintiffs' property. This would seem to be clearly settled
by the decision of this Court in the recent case of *Melvin* v.
*Schlessinger,* 138 Md. 337.

PATTISON, J., delivered the opinion of the Court.

The bill in this case was filed by Frank M. Stinchcomb
and Sarah A. Stinchcomb, appellees, against the appellants.

The appellees own a tract of land lying at the mouth of the Magothy River, in Anne Arundel County, and bordering partly on the river and partly on the Chesapeake Bay.

The appellant Masonetta M. Waring owns a tract of land bordering on the Chesapeake Bay, lying to the east or southeast of the appellees' land.

The land of the appellant Masonetta M. Waring, which is known as "Pettybones Rest," was granted to Richard Pettybone by patent on the 25th day of October, 1673.

The property now owned by the appellees is composed of two tracts of land, one granted on the 10th day of May, 1685, to Richard Bayly, designated as "Bettys Point," and the other granted on the 24th day of September, 1663, to Henry Woolchurch and designated as "Leonards Neck."

"Bettys Point" is described in the patent as lying in Anne Arundel County "on the south side of a river called Magothy River and on the west side of a creek called Magothy Creek, beginning at the mouth of said creek and running up the said creek south fourteen perches to the easternmost bounds of a parcel of land formerly laid out for Henry Woolchurch called 'Leonards Neck,' " etc..

"Leonards Neck" we need not describe further than to say that it bordered on the Magothy River to the west of "Bettys Point."

The location of "Pettybones Rest' is described in the patent as "lying in Anne Arundel County on the west side of the Chesapeake Bay, bounding on the east by the said bay from Burles ponds to a creek by the mouth of Magothy River called Magothy Creek, on the north by the said creek." etc.

It will thus be seen that, by the patent, the tract of land known as "Bettys Point" was separated from "Pettybones Rest" on the bay by the mouth of Magothy Creek, "Bettys Point" lying to the west or north of the creek and "Pettybones Rest" to the east or south of it.

In the bill, it is alleged:

"That the original outlet of the said Little Magothy River (or Magothy Creek) has closed, and there has

been formed by alluvion and accretion from the said original outlet of said Little Magothy River (or Mago-thy Creek) a considerable body of sand extending from the line of the property of said defendants lat-erally across the front of the property of the plain-tiffs, and directly in front thereof, so as to exclude from the bay and Magothy River a large portion of their property, and to that extent making of their property an inland farm.

"That for many years there has existed a fence across the aforesaid strip of sand so as aforesaid formed by alluvion and accretion, erected by the for-mer owner of (the land of) said defendant, Alfred A. Stinchcomb, *at a point, within the memory of said plaintiffs, where the outlet of said Little Magothy River existed.*

"That recently the defendants have undertaken to come on the side of said fence where the property of the plaintiffs is located and attempted to claim, unjustly and without right or justification in law or good morals, the entire strip of land extending across the property of the plaintiffs, and thereby to that extent to deprive them of valuable water-front privi-leges, and to the destruction of their property in the manner in which it has always been used and enjoyed.

"That such claim on the part of the defendant will work an irreparable wrong to the property of the plaintiffs, by making of their said property, to the extent of said alluvion and accretion, an inland farm, thereby depreciating same in value to the extent of many thousands of dollars, and if persisted in will eventually shut out the plaintiffs from access to the bay shore, and make their said property valueless as a water front property.

"That the defendants have recently torn down and removed the aforesaid division fence erected by the late Alfred A. Stinchcomb, father of the defendant, Masonetta M. Waring, and attempted to obliterate all marks thereof as to its location, and, after the plaintiffs at great expense and work rebuilt same at

the same location as fixed by the survey thereof, before it was destroyed by the defendants, the defendants, or their agents and servants, came upon the property of the plaintiffs and again destroyed said fence.

"That said plaintiffs are now engaged in rebuilding said fence a second time, and unless the defendants are restrained by this court from so doing, the plaintiffs believe and charge (they) will again destroy same.

"That the defendant has refused and still refuses to allow the plaintiff to maintain and continue the said fence above referred to in its proper use, and to which they are clearly entitled, and the plaintiffs are without adequate remedy at law without an action for each trespass, which would make a multiplicity of suits, and are without redress except by the intervention of this honorable court."

The bill then prays:

"First—That the defendants, her, his or their agents, servants and employees, may be restrained from in any manner interfering with the plaintiffs. their agents, servants and employees, in the maintenance of the fence hereinbefore referred to and from molesting or destroying same.

"Second—And that the plaintiffs may have such other and further relief as their case may require."

Upon the bill, an injunction was granted with leave to the defendants to file a motion to dissolve it after filing their answer within the time therein mentioned. The defendants filed their answer and motion, and in their answer denied that the original mouth or outlet of Magothy Creek had ever closed, though its location had "shifted to an unappreciable extent during the course of time, leaving the lines of the property of the plaintiffs and defendants, respectively, unchanged except in so far as the defendants' land has been added to by the sand formation contiguous to their original tract"; and they allege that the formation mentioned is exclusively on the defendants' side of Little Magothy River

and nowhere touches the plaintiffs' land, it being separated therefrom by said creek; that said "sandbar and extension have from time immemorial been considered as belonging to the lands now owned by the defendants, without any claim or pretense having previously been made to ownership by the plaintiffs or their predecessors in the title." They admit however that they erected the fence across this formation near the mouth of Little Magothy River, but allege it was done for the purpose only of enclosing a pasture thereon, as the formation above that point, that is to the westward of it, was a sand formation and unfit for pasture. They also allege that the fence was not intended to be and was not actually a boundary or dividing fence; but that the entire sand strip was a contiguous part of defendants' land exclusively, and that the fence was located at said point solely for the purpose above stated. They also allege that they had sold this formation of land to a point south or eastward of the fence and the purchaser had subdivided and platted it into small lots, for which reason it became necessary for them to remove the fence, to a point further inland upon their remaining property; that, thereafter, the plaintiffs, without leave or license, trespassed upon the lands of the defendants, which had been sold, but not yet conveyed to the purchaser, and rebuilt the fence upon the line, where it had been originally built by them; that they, acting within their rights, removed the fence and subsequently the plaintiffs again trespassed upon their land and rebuilt the fence.

They also allege they have not trespassed upon the lands of the plaintiffs or attempted to locate or to claim any property of the plaintiffs, but said formation is their property, being contiguous to their farm, and has always been used and occupied by them as part of it and their ownership of it acknowledged by the plaintiffs.

They deny that the formation, though held by them as their property, will work an irreparable wrong to the property of the plaintiffs, or that any act attributable to them will depreciate the value of the plaintiffs' property, or shut out the

plaintiffs from access to the bay shore, or make their property valueless as water-front property. On the contrary, they allege the plaintiffs have approximately three-fourths of a mile water-front on Chesapeake Bay, irrespective of the sand strip in question, and the value of their farm as a water-front property is in no sense dependent upon said sand strip. That the sand strip in question does not cover the front of the plaintiffs' property, as alleged, but runs along a low pasture field of theirs, and has no appreciable effect on the value of the plaintiffs' land; that the main portion of plaintiffs' farm is on a high elevation overlooking Chesapeake Bay, and its value as a farm and as a water-front property is attributable to that fact and to nothing affected by the sand strip in question.

They also "deny that they have obliterated or attempted to obliterate any marks as to the location of a division or boundary fence." And they also deny that the plaintiffs are without adequate remedy at law, and whatever redress, if any, is open to the plaintiffs, is obtainable therein, as the sole question involved is one of title to the strip of sand mentioned, and that the court is without jurisdiction in the premises.

The court, after hearing the evidence upon the bill and answer, reached the conclusions, as shown by the opinion found in the record:

"That the true boundary line between the lands of the plaintiffs and defendants is the outlet of said creek where it enters or receives the waters of the Little Magothy River through the center line of said outlet to the point marked 'X' on the plat marked 'Complainants' Exhibit A,' and thence, continuing said line in the same direction, by courses and distances, to the waters of the Chesapeake Bay; and that in establishing said line the county surveyor who is directed to make and plat the same is directed to give the exact courses and distances of this outlet, as well as the line across the sand beach to the bay."

And when the survey was made, as directed, the court would pass its decree declaring the line so established to be the true boundary line between the lands of the plaintiffs and defendants, etc.

A plat was thereafter made pursuant to the direction of the court, and on the 28th day of March, 1922, it was

> "Adjudged, ordered and decreed by the Circuit Court for Anne Arundel County that the true boundary between the lands of the plaintiffs and defendants, as mentioned in these proceedings, is hereby determined, ordained and established by a line drawn as follows: Beginning for the same at a point in the center of the outlet from Little Magothy River at a point marked with the letter 'A' on the plat made by J. Carson Boush, County Surveyor, on the 27th day of March, in the year 1922, and filed herewith, where said outlet leaves the waters of said Little Magothy River, and running from thence with the center of said outlet north 17 degrees 30 minutes east for the distance of 430 feet; thence north 45 degrees 30 minutes east for the distance of 190 feet; thence leaving said outlet and running across the said beach north 27 degrees 30 minutes east for the distance of 293 feet to a stake on the shore of Chesapeake Bay.

> "And it is further ordered that a writ of injunction be issued, enjoining and prohibiting the defendants, etc., from in any manner interfering with said boundary line or doing any act to impair same, *and the injunction heretofore granted is hereby dissolved.* The parties plaintiffs and defendants are each decreed to pay their own costs, except the costs of the county surveyor for running the divisional line under the directions of this court, which shall be divided equally between the parties, plaintiffs and defendants."

It was from this decree that the appeal in this case was taken.

There is no evidence in the record showing just where the mouth of the creek or the outlet was at the time of the

issuance of the patents mentioned, and it may be found difficult to produce such evidence after this lapse of time, but it is an undeniable fact that the point where the waters of the creek now empty into the Chesapeake Bay is far westward of its original outlet and of its location at the time it was first known by those who were familiar with it twenty to fifty years ago.

A large number of witnesses offered by the plaintiffs testified that within the period of twenty years immediately preceding the filing of this bill, the fence here involved was at the outlet of the Magothy Creek, and others, who had known the land for the period of forty or fifty years, said that when they first knew the creek its outlet was about one hundred yards or strides to the eastward of the location of the fence in question. This was denied by the witnesses offered by the defendants, that is to say, while they admitted that there was some shifting of the mouth of the creek or outlet to the westward, they said it was never at the times mentioned so far eastward as stated by the plaintiffs' witnesses.

Walter C. Munroe, a surveyor who made a plat in June, 1921, showing the location of the mouth of the creek and the lands lying on each side of it—those belonging to the plaintiffs and defendants respectively—testified that at that time it was 1,250 feet from the fence westward to the furthermost point of the formation where the water from the Magothy Creek flowed into the Chesapeake Bay; and that he had since, about two weeks prior to the time of his testifying in this case—September 22, 1921—again measured the distance from the fence to the westernmost point of the formation or outlet and had found it to be 1,325 feet, or 175 feet further westward from the fence than it was in June prior thereto—a period of about three months only.

The evidence offered by the appellees shows that forty or fifty years ago there was a beach bordering upon the bay sixty to one hundred feet in length, between the high land of

"Bettys Point" and the mouth of the creek at that time. The witnesses of the appellant admit that there was a beach at the place stated, but that it was not more than twenty feet in length. The "Boush" plat, made under the direction of the court, which the reporter is requested to insert in his report of this case, and other maps or plats filed in the case, show that the creek at its mouth is very narrow, it being, as disclosed by the evidence, only ten to thirty feet in width and from a few inches to two feet in depth. This stream widened at the point marked "A" upon the "Boush" plat, and in some places above that point it was as much as one half mile in width and extended therefrom several miles in length.

It is also shown from the plat mentioned that on each side of the stream at the point named the land was low, either marsh or sand, and that it extended northward to or near the place where, it is claimed, the waters from the creek emptied into the bay forty or fifty years ago, when, as stated by appellees' witnesses, there was a beach from sixty to one hundred feet between the mouth of the creek and the high lands of "Bettys Point."

The earlier maps filed in the case show there was an indentation in the bay at the point where the waters of the creek then flowed into the bay, and that the land to the eastward or southward of the mouth of the creek, including "Pettybones Rest," projected much further into the bay than it did at the mouth of the creek. This projection was gradually washed away until the line of the shores at the mouth of the creek, as shown by the later plats, was practically straight with the shore line in front of "Pettybones Rest." In all probability, it was not until then that the mouth of the creek was materially affected by the sand formation. The result of the deposit of sand brought there by the northeast winds was to close, or partially close, the mouth of the creek. When this was done the waters in the creek had to find another outlet to the bay, and that outlet had to be found at a point west of the original mouth of the creek, as the formation extended in that direction, and in seeking an outlet the water naturally flowed over the lowest part of the beach to the bay, and as the stream is no longer found at the distance of sixty to one hundred feet, or even twenty feet, from the high lands of "Bettys Point," but immediately thereunder, the testimony of both Mr. and Miss Stinchcomb, the plaintiffs, may be understood.

Mr. Stinchcomb, when asked "Where is that beach at the present time?" said, "Well, part of it is across that stream." "Do you mean that a part of your original beach is on the outer side of that present stream or outlet of Magothy Creek? Yes." He was then asked: "Since you have known it and been

familiar with it for sixty-four years, what has caused and
how is that formation you speak of as running in front of
your property been made? A. It has been made by sand
washing up over on our beach and putting the stream upon
our beach and coming through. The sand piled until it
turned that stream over across our beach and left a part of
our beach on the outside." And Miss Stinchcomb, when
asked about the beach referred to, said it was on the other
side of the stream, that when the mouth of the creek filled in
it started the stream through their beach, leaving a part of
their beach on the other side of the stream, and that the
stream as now located "is in places right up to our bank."

It did not follow, when the sand drifted in the mouth of
the creek, that the diversion of the water therein started at
that point, but, as stated by the appellees' witness, it made its
way across the beach of the appellees, starting at a point
some distance up the stream from its mouth and found an
outlet to the bay at a point upon the beach west of the closed
mouth of the creek. Consequently the accretion to the beach,
between the old and new mouth, was to the land of the appel-
lees; therefore the newly formed land caused thereby was the
property of the appellees, and this is true of all the land
subsequently formed by accretion thereto in front of the lands
of the appellees.

But if the land in dispute in front of appellees' lands was
formed in the manner claimed by the appellants, we are
still of the opinion that it is the property of the appellees.

It is claimed by the appellants that the disputed land in
this case started in its formation by accretion to their land,
and extended westward across the divisional line between
their land and the land of appellees and thence with the
shores of the appellees' land, a distance of fourteen hundred
feet, but at no point was the newly formed land attached to
the land of the appellees, but was separated therefrom by
the narrow stream above described. It is because of its
separation from the lands of the appellees that the claim is

made by the appellants that it is not the property of the appellees. This should not be, and we think is not, the law applicable to the rights of riparian owners.

In *Lamprey* v. *Metcalf,* 52 Minn. 181, the Supreme Court of Minnesota, in discussing the reason for the law, giving accretions and relictions to the riparian owner, says: "The reasons usually given for the rule are either that it falls within the maxim *de minimis lex non curat,* or that, because the riparian owner is liable to lose soil by the action or encroachment of the water, he should also have the benefit of any land gained by the same action. But it seems to us that the rule rests upon a much broader principle, and has a much more important purpose in view, viz: to preserve the fundamental riparian right—on which all others depend, and which often constitutes the principal value of the land—*of access to the water.* The incalculable mischiefs that would follow if a riparian owner is liable to be cut off from access to the water, and *another owner sandwiched in between him and it, whenever the water line had been changed by accretions or relictions, are self evident, and have been frequently animadverted on by the courts."*

To hold that the land involved in this case belonged to the appellants would entirely exclude the appellees from the bay, at least to the extent the land has formed off their shore, and would deprive them of their riparian rights in respect thereto.

It would sandwich the appellants between them and the bay, and would not only be in conflict with the rule above laid down, which is generally accepted by the courts of this country (*Crandall* v. *Allen,* 118 Mo. 403), but it would deprive the appellees of the right given them by statute to build out in the water in front of their land. Code, art. 54, sec. 48.

Upon the facts of this case we have no difficulty in reaching the conclusion that the formations in front of the appellees' land is their property, and not the property of the appellants, and there can be no serious question as to the jurisdiction of

the equity court to grant the relief here sought. *Dowdle* v. *Wheeler*, 76 Ark. 529; *Crandall* v. *Allen*, 118 Mo. 402; *Stoner* v. *Royar*, 200 Mo. 444.

The court was asked by the prayer of the bill to restrain the appellants from interfering with the appellees in the maintainance of, and from molesting and destroying, the fence mentioned in the bill.

"It is the settled law of this State, that though an injunction will not lie to restrain a trespasser merely because he is a trespasser, yet equity will interfere where the injury is irreparable, or where full and adequate relief cannot be granted at law, or where the trespass goes to the destruction of the property as it had been held and enjoyed, or to prevent multiplicity of suits." *Shipley* v. *Ritter*, 7 Md. 408; and other cases cited in the opinion of the lower court.

The bill charges the defendants with the destruction of the fence, which it alleges was a division fence between the lands of the plaintiffs and defendants. To this charge the defendants answered, saying the fence was both erected and destroyed by them, but it was erected across *the end* of their property near the mouth of the creek in order to enclose a pasture on their lands, and was "not *intended* to be, and was not *actually* a boundary or dividing fence."

It is not essential for the purpose of this suit that the fence should have been an *actual* boundary, or that it should have been intended by the appellants as a division fence, if, as a matter of fact, it was at the mouth of the creek, for to that point, if no further, the lands of the appellees extended, and as the mouth of the creek was shifting westward, it was important to the appellees that such evidence of its location, even at that time, should be preserved and not destroyed. The defendants were not only charged with the destruction of the fence, but with an "attempt to obliterate all marks thereof as to its location." In addition to this, the appellants had sold the land formation lying in front of appellees' lands, and the purchaser had platted it in lots with the view of disposing

of them to persons by whom homes were to be constructed thereon; the effect of which would amount to a destruction of the plaintiffs' property as it is held and enjoyed by them. These facts and others, in our opinion, justified the interposition of a court of equity, and upon the evidence disclosed by the record, the injunction, restraining the defendants from interfering with the plaintiffs in the maintenance of the fence and from molesting or destroying the same, should have been made permanent. But the court in its decision dissolved the injunction granted by it, and established a boundary line between the parties, which we have hereinbefore set out.

Witnesses offered by the appellees, who were familiar with the lands of both the appellants and appellees forty or fifty years ago, testified as to the relative location of the mouth of the creek at that time to the fence in question. Some said it was one hundred yards therefrom, others "about one hundred strides," others that it "was well on to a hundred yards," and some estimated the distance at seventy-five yards. At the time as to which they testified, the fence had not been erected, and consequently their estimate of the distance between the two objects mentioned was made without the existence of one of them. It seems that it was upon this evidence, together with the courses of the creek, as shown by a plat filed in this case, that the learned judge established the boundary line between the parties, and thereafter enjoined each of them from "interfering with said boundary line or doing any act to impair same."

This relief, as we understand it, was granted under the prayer for general relief, as to which it has been held that, when there is a prayer for special relief and also a prayer for general relief, the court may, if it refuses specific relief, grant any other appropriate relief under the general prayer, but the relief afforded by the decree must conform to the case made out by the pleading as well as by the proof, and the relief granted under such general prayer must not be repug-

nant to or inconsistent with the specific prayer and must be warranted by the allegations of the bill. *Sloan* v. *Safe Deposit & Trust Company,* 73 Md. 239; *Dunnock* v. *Dunnock,* 3 Md. Ch. 140; *Chalmers* v. *Chambers,* 6 H. & J. 29; *Lingan* v. *Henderson,* 1 Bland, 236; *Chatterton* v. *Mason,* 86 Md. 246; *Miller's Equity Procedure,* sections 100 and 101, and cases there cited.

The court, in granting the relief it did, if not exceeding the power of a court of equity in so doing, went far toward widening the scope of the prayer for general relief to an unwarranted extent. But we need not pass upon these questions, as in our opinion the court erred in granting such relief upon the evidence before it. For the reasons stated, the decree appealed from will be reversed and the case remanded, in order that a decree may be passed in accordance with the views herein expressed.

> *Decree reversed, case remanded, that a decree may be passed in accordance with the views herein expressed, each party to pay one-half of the costs in this Court and in the court below.*