PHILIP WLODAREK *v.* JAMES F. THRIFT ET AL.

[No. 53, April Term, 1940.]

454

**456**

*Decided June 12th, 1940.*

The cause was argued before OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, JOHNSON, and DELAPLAINE, JJ.

*J. Paul Schmidt,* with whom were *Avrum K. Rifman* and *J. Carroll Power* on the brief, for the appellant.

*Vernon Cook,* for the appellees.

PARKE, J., delivered the opinion of the Court.

In this action the original declaration had Philip Wlodarek, Eleanor Durkie and Adam F. Durkie, her husband, and the Realty and Mortgage Company, a body corporate, united as parties plaintiff, with James F. Thrift and David G. McIntosh, individually, and as law-years associated as partners under the firm name of McIntosh & Thrift, as the defendants. As a result of a demurrer the declaration was amended so that Philip Wlodarek became the sole plaintiff; and the defendants pleaded the general issues of *non assumpsit* and *nil debet,* and issues were joined thereon and the action went to trial with a jury. At the conclusion of the testimony, prayers were offered by both sides, but the court acted upon but two prayers. These prayers directed a verdict in favor of the defendants, and the jury gave its verdict accordingly. A judgment in favor of the defendants was duly rendered, and the plaintiff has appealed. The ruling of the trial court on the two demurrer prayers is made the subject of the thirteenth bill of exceptions, and the other twelve exceptions are to the action of the court on the testimony.

One of the prayers granted was a general demurrer to the legal sufficiency of the evidence to entitle the plaintiff to recover, and the other granted prayer denied the action on the theory that the plaintiff as a mere stockholder in a corporation had no right of action for damages sustained by the corporation in its real estate. The withdrawal of the case from the jury requires a careful examination of all the testimony in order to ascertain whether the determination of the court should be sustained.

Since by the granting of the demurrer prayers the issues of fact were not submitted to the jury, all the testimony in support of the right of action must be accepted as true. It was upon this assumption that the trial court acted, no matter what might be the conflict of testimony and the court's view of its weight of credibility. Without setting it forth in detail, there is on this record legally sufficient testimony tending to show these facts.

James F. Thrift and David G. McIntosh are attorneys who compose the law firm of McIntosh & Thrift. In the course of their practice they make examinations and abstracts of titles for their clients, for reward. The defendant Thrift informed the plaintiff that the firm guaranteed its title work. For a fee of forty dollars the defendants entered into a contract with the plaintiff to examine the title to two blocks of lots of land in Anne Arundel County for the purpose of informing the plaintiff whether the apparent owners of the lots could convey a good and merchantable title. The examination was made in the first part of 1925, and the plaintiff was advised by the defendants that the examination of title by them established that the purporting owners of the lots held them in fee simple by a good and merchantable title. In reliance upon said examination and report, the plaintiff bought and paid for the lots, which were known as Nos. 20-25 in one block and 13-15 in the second, on the plat of "Bay Head," but had the title to them conveyed to Eleanora Durkie and Adam F. Durkie, her hus-

band, so that, while the record title in fee simple was vested in said grantees, the title was held by the grantees for the sole use and benefit of the plaintiff. The deed for Lots Nos. 20-25 was executed on February 19th, 1925, and the plaintiff took possession of the lots, and on August 29th, 1928, in execution of their agreement, the grantees of the legal title to the lots Nos. 20-25, along with another distinct block embracing Lots Nos. 13-15, at the request of the plaintiff, conveyed them in fee to the Realty and Mortgage Company, a body corporate of the State of Maryland, upon a similar agreement to hold the legal title to the lots for the use and benefit of the plaintiff.

The two successive grantees of the legal title to the lots gave no consideration whatsoever, and, under the agreement with the plaintiff, were the successive grantees of the bare legal title. The plaintiff paid the fee of the defendants for the examination of the title, the purchase price of $2760 for Lots Nos. 20-25 to their original vendor, and the taxes assessed against the said lots, until October 14th, 1933, when one Sarah Stinchcomb asserted that she was the owner in fee simple of said lots. The plaintiff forthwith made the adverse pretensions known to the defendants, who affirmed that the title to the lots was in fee simple and good and merchantable.

Some time in the summer of 1933, the plaintiff had a prospective purchaser for Lots 20 to 25, inclusive, who had the title examined by his attorney. The examiner reported that the nominees of the plaintiff had acquired no title to the lots, and the sale was lost. The plaintiff had an interview with the attorney who had examined the title for the prospective buyer, and, with the information received, called upon the defendants and saw Thrift. It was insisted by the defendants that the title was good and merchantable, but finally Thrift and the plaintiff agreed to call upon the attorney whose examination had discovered the defect. At the interview, the two attorneys talked apart and, after they separated, the plaintiff was told by Thrift that the title was bad.

The plaintiff then demanded to be compensated for the loss, and Thrift claimed the right for time to make the title good, but did nothing promptly to that end. However, as a result of the plaintiff's importunity to act, Thrift instituted a suit in equity against Sally Stinchcomb in the name of the Realty and Mortgage Company, to quiet the title then of record in the company as heretofore stated.

The plaintiff testified that the defendant Thrift asserted that he could get the title straightened out through court, but that his "firm was perfectly responsible to me for the title and whatever I had in it, but I must have patience until it goes through court, and after all means are exhausted through court when then is the time that that McIntosh & Thrift were going to pay me my money. I hadn't a thing under the sun to worry about. He said, it was a responsible, reliable firm, and they guaranteed me the title, and they were ready and willing to make good if they couldn't get it cleared up through court." The costs and expenses of the litigation were to be borne by the defendants, but they repudiated the obligation, and the plaintiff paid these charges.

The Realty and Mortgage Company, Incorporated, was organized in the month of March, 1926, and the defendants were the attorneys in its formation. No stock was ever issued, and no one ever contributed or invested any capital except the plaintiff. The plaintiff had the five lots conveyed to it in order to give it assets, in the event the plaintiff wanted to secure a loan for the company, but the corporation never functioned, as the defendants did not fulfill their promise to put money into the enterprise. All the money and property were supplied by the plaintiff and, although the formalities of incorporation, the adoption of by-laws, the procurement of a seal, and the minutes of the first meeting, were provided or directed by the defendants, the corporate existence was nominal, and all its assets furnished by the plaintiff, who solely carried on, conducted and controlled whatever was done in its corporate name and behalf. He paid the franchise tax until 1935, when he stopped.

In addition to the assertion in 1933 of counsel for the prospective buyer, a Doctor Hess, that the title to the five lots was defective, a Miss Sally Stinchcomb claimed title to the lots, and in 1933 put up a fence in accordance with her pretensions, which embraced Lots Nos. 20 to 25, inclusive. After the building of this fence, but in the same year, the defendants brought the heretofore mentioned suit in equity against the claimant, Sally Stinchcomb, in the name of the Realty and Mortgage Company, Incorporated, to quiet the title in the latter. The decree was obtained on April 23rd, 1936, but the defendant appealed, and this court reversed the decree and dismissed the bill of complaint, as is reported in the appeal of *Sarah Stinchcomb v. Realty Mortgage Company, Inc.*, 171 Md. 317. On being informed of this adverse result, the plaintiff renewed his demand for in-demnification, but was urged to be patient, as a motion for re-argument had been made. The motion was not granted, and the plaintiff was advised by Thrift that title to the five lots had been lost.

After the plaintiff made his discovery in respect of the title, it is in evidence that Thrift interviewed David Fyffe, the grantor of lots Nos. 20 to 25 to the Durkies, and told Fyffe that he had no title, and, on Fyffe's inquiry of Thrift if the latter had not searched the title, Thrift's response was that he had relied upon Fyffe's word as to the title.

The transactions were practically all had with the defendant Thrift, who acted for the partnership. It was he who, for the partnership, entered into the original contract and later conducted or directed all the subsequent transactions. The papers in relation to the incorporation of the Realty and Mortgage Company were, however, prepared by McIntosh, and he later participated in some of the conferences which grew out of the relation of client and counsel. Whatever may be the liability of McIntosh is the liability of the law partnership, which here bound both by the acts of either in respect of the employment in question.

The testimony on the part of the defendants was in flat contradiction of that offered to sustain the plaintiff's case. Their testimony was in categorical denial of their employment either to examine the title to Lots Nos. 20-25 or to express an opinion of its being good and merchantable. It is their testimony that the plaintiff had previously had the title to these six lots examined, and that all they were employed to do, and all they did, was to draw the deed for these lots. If their testimony be accepted, there is no liability of the partnership on account of the defect in title. On the other hand, if the testimony on the part of the plaintiff be taken as true, (1) the defendants entered into a contract for a reward with the plaintiff to examine the title to Lots Nos. 20-25 for the purpose of informing the plaintiff whether the title was a good and merchantable one; and (2) the defendants breached that contract by not making any examination of title and, notwithstanding such failure to examine, by advising the plaintiff that the title in question was good and merchantable, whereby (3) the plaintiff sustained material loss and injury as a direct consequence of such breach and because the title was not good and merchantable.

The issues of fact raised by the irreconcilable conflict of testimony on the respective parts of the plaintiff and of the defendants are not for the resolution of the court but for a finding of fact by the jury. Whatever may be the conviction of the trial court or of this tribunal as to what were established as facts by the conflicting testimony, the issues of fact are and must remain inviolably the function of the jury. It is, therefore, error for the court to have withdrawn the resolution of this contradictory testimony from the jury, unless all the testimony in the cause tending to support the plaintiff's case, when assumed to be true to its utmost credible extent, is nevertheless legally insufficient to entitle the plaintiff to recover. For every breach of a contract, there is a right of recovery of at least nominal damages. The action and pleadings are in contract, and, if the plaintiff's testimony

of the terms of the contract be true, the failure of the defendants to examine the title, as the plaintiff's testimony tends to show was agreed for reward, is a breach of contract for which an action *ex contractu* lies. The question of the measure of damages then becomes important, and, that is the material problem on this appeal (a). Upon the assumption of what the testimony tends to prove in support of the plaintiff's case as the facts found by the jury, the recovery of substantial damages depends upon the concurrent existence of these primary conditions: (first) that the title was not good and marketable; (second) that the defect making it so was one which, by the exercise of reasonable and ordinary care and diligence upon the part of the defendants, might have been discovered, and, so discovered, was of such a nature that no reasonable doubt may be entertained by an attorney possessed of that reasonable degree of knowledge and skill which is requisite and necessary under the circumstances, that the title was by such defect rendered not good and marketable (b); and (third) that the plaintiff suffered other than nominal damages (c) as the proximate result of the breach of contract by the defendants.

(a) *Williston on Contracts* (Rev. Ed., secs. 1339a, 1340; *Sutherland on Damages* (4th Ed.), secs. 9-11; *Brent v. Davis,* 9 Md. 217, 228, 229.

(b) 2 *Mechem on Agency* (2nd Ed.), sec. 2202; *National Savings Bank v. Ward,* 100 U. S. 195, 25 L. Ed. 621; *Warvelle on Abstracts and Examination of Titles* (4th Ed.), sec. 619, pp. 654-656; *Caltrider v. Weant,* 147 Md. 338, 339-341, 128 A. 72; *Watson v. Calvert Bldg. & Loan Assn.,* 91 Md. 25, 33, 45 A. 879; *Cochrane v. Little,* 71 Md. 323, 18 A. 698; *Brewster v. Frazier,* 32 Md. 302.

(c) 2 *Mechem on Agency* (2nd Ed.), sec. 1291; *Horner v. Beasley,* 105 Md. 193, 198, 65 A. 820; *Ahrens v. Ijams,* 158 Md. 412, 423, 148 A. 816.

I. There is testimony tending to show that the plaintiff employed the defendants to examine and pass upon the title to certain lots in Anne Arundel County which

one Thomas J. Fyffe claimed to own in fee simple, and which the plaintiff was under contract to buy, if the title were good and marketable. The land and equity records of Anne Arundel County disclose that Fyffe had neither a good nor marketable title to these lots, as had been adjudicated at the time he took his deeds to the land involved in the present controversy.

The facts are that Masonetta M. Waring, wife of Everett Waring, and Frank M. Stinchcomb and Sarah A. Stinchcomb, were the owners of adjoining tracts of land which fronted on the Chesapeake Bay and were anciently divided by the waters of Little Magothy River or Creek as it ran and emptied into the Chesapeake Bay. In the course of time the original outlet of the river gradually became filled by alluvium, so that the river sought and found a new outlet and left, by accretion and change in the westerly course of the river to its new outlet, a bar or strip of land between the location of the river's present bed to its south and the water of the Chesapeake Bay to its north. The length of this strip of land from the former outlet of the river, on the east, to land's end at the new outlet into the bay, on the west, was about 1500 feet in June, 1921. The strip was of varying width and conformed to the winding of the river. Where its eastern boundary, or filled ancient bed of the river was fast to the land of the Waring tract, the strip was about 242 feet wide. It extended from that line westward, in front of the Stinchcomb property for about 1500 feet, tapering to a narrow tongue of land at the west. The situation described is shown by a plat in 141 Md. 569, at page 579, 119 A. 336, where the case of *Waring v. Stinchcomb* is reported.

The title to this strip of land, west of the ancient outlet of the river, was claimed by Masonetta M. Waring, and also by her contiguous landowners, Frank M. Stinchcomb and Sarah A. Stinchcomb. In the assertion of her claim, Mrs. Waring built a fence across the strip to the west of the ancient mouth of the river, which brought about the destruction and rebuilding of fencing accord-

ing to the contention of the parties. The conflicting claims of the adjoining owners resulted in the filing, on July 12th, 1921, of a bill of complaint in the Circuit Court for Anne Arundel County, in equity, by Frank M. Stinchcomb and Sarah Stinchcomb against Masonetta M. Waring and J. Everett Waring, her husband, asking for an injunction to restrain the defendants from interfering with the plaintiffs in their maintenance of a fence along the ancient course of the river, and praying for general relief.

On the supposition that Masonetta M. Waring was the owner of the land along the Chesapeake Bay not only to the east, but also the strip to the west, of the ancient outlet of the river, a certain Thomas J. Fyffe laid out and platted, some time in July, 1921, the land to the east and west of the old outlet and fronting on the Chesapeake Bay, into lots to form a subdivision of what was called "Bay Head."

The equity cause mentioned, after the taking of testimony by the respective parties, came on for a hearing and decree. The issue was one of title, and this, in turn, depended upon the true boundary line between the contiguous land owners. The chancellor determined the true boundary line between the contestants, and directed a survey to be made according to his finding and returned to the court for a final decree. The plat was filed and is reproduced at page 579 of 141 Md., 119 A. 336, and the court passed on March 28th, 1922, its final decree, whereby, beginning at point A on the plat where the wide waters of the Little Magothy River narrow for an outlet to the Bay, two courses and distances of the division lines are given, at the end of which the outlet in its new course turns sharply to the west, and then from that end the third, or north 27 degrees 30 minutes east, boundary line extends 293 feet across the beach, along the ancient outlet of the river, to the Bay. The effect of this decree was to confirm in the Stinchcombs the title to all of the strip or sand bar between the bed of the new outlet and the Bay, and west of the line running N. 27 degrees 30 minutes east, 293 feet to the Bay.

An appeal was taken by the Warings. The court reversed the chancellor on the sole ground that on the evidence he was not justified in decreeing the courses and distances of the division line with the certainty of courses and distances. On the main question, the court is clear. It said, 141 Md. at page 581, 119 A. at page 340:

"Consequently the accretion to the beach between the old and new mouth was to the land of the appellees (Stinchcombs); therefore the newly formed land caused thereby was the property of the appellees, and this is true of all the land subsequently formed by accretion thereto in front of the lands of the appellees." And the court refers to the Fyffe plat, which was made after the sale of the land but before the conveyance, in these terms: "In addition to this, the appellants had sold the land formation lying in front of appellees' lands, and the purchaser had platted it in lots with the view of disposing of them to persons by whom homes were to be constructed thereon, the effect of which would amount to a destruction of the plaintiff's property as it is held and enjoyed by them."

The Fyffe plat shows there were thirty-six lots in the subdivision fronting on the Chesapeake Bay, and they were designated by successive numbers, counting from east to west. As indicated on the copy of the plat filed and recorded with the deed of April 8th, 1922, of Masonetta M. Waring and J. Everett Waring, her husband, to Thomas J. Fyffe, for Lots Nos. 1 to 17, both inclusive, and part of Lot No. 18 of said plat, the N. 27° 30' East 293 feet line, as run on March 2nd by the county surveyor, divides Lot No. 18 diagonally. The first block of Nos. 1-18 lies to the east of the ancient outlet of the river and the second block of Nos. 19-36 is to the west of the old outlet. There is no question of the validity of the title to Lots Nos. 13, 14 and 15, as these are in that part of the subdivision which is east of the line. Lots Nos. 20-25, however, are in the group west of the line, and are in front of the Stinchcomb land. This land was held by the chancellor below, and affirmed on appeal, to be the property of the Stinchcombs.

The mandate of the appellate court in the case mentioned was received and filed on August 17th, 1922, and, in obedience to its command, the chancellor passed on December 19th, 1922, a decree in accordance with the views expressed in the opinion. By this decree the formation and accretions thereto, in front of the Stinchcomb land, between the old and the new mouth of Little Magothy River or Creek, is adjudged to be the property of Frank M. Stinchcomb and Sarah A. Stinchcomb, and the defendants Waring were enjoined from interfering with the maintenance of the fence set up by the plaintiffs on the ancient division line. This decree finally established the legal title to the Lots Nos. 20-25, to be in the Stinchcombs, and, therefore, no title passed to Lots Nos. 20-25 by the deed of Masonetta M. Waring and J. Everett Waring, her husband, to Thomas J. Fyffe, dated July 5th, 1924; nor by deed from Thomas J. Fyffe and wife to Adam F. Durkie and wife, dated 19th day of February, 1925; nor by deed from Adam F. Durkie and wife to Realty and Mortgage Company, dated August 29th, 1928. Accordingly, no good and marketable title to Lots Nos. 20 to 25 was acquired, and the first condition is fulfilled for actual damages.

II. The second condition is also met by the testimony which tends to establish that a proper examination of the title in Fyffe would have referred the defendants to the land record of the Fyffe deed and plat of the lots showing their relative position with reference to the Stinchcomb and Waring lands; and to the equity cause mentioned, which would have revealed the controversy in reference to the title to the lots and the adjudication of title in Frank M. Stinchcomb and Mary Stinchcomb as against Masonetta M. Waring, wife of J. Everett Waring, the person under whom Fyffe claimed. In addition, the testimony on the part of the plaintiff was that, when he employed the defendants to examine and ascertain whether the title was good and merchantable, he gave a reference to the case of *Waring v. Stinchcomb, supra,* for their information and consideration.

If the defendants had exercised reasonable and ordinary care and diligence in the employment they undertook for reward, as the plaintiff offered testimony tending to prove they did so undertake, they would, in the exercise of that reasonable degree of knowledge and skill which was requisite and necessary under the circumstances for them to possess, have found and reported that the title in question was not good and marketable. The defendants did not make such an examination, and, on the plaintiff's testimony, are shown to have represented the title to the plaintiff to be good and marketable. The failure of the defendants to exercise the reasonable knowledge, diligence and skill which they possessed as lawyers and examiners of title by making the examination of title is a breach of the contract for which the defendants are responsible in damages, if the jury accepts as true the plaintiff's version of the transaction.

III.   The third condition for actual damages is also met by the testimony here stated on the part of the plaintiff, if believed by the jury to be true. The breach of the contract is clear, and the right of action accrued immediately on the breach.

There was testimony offered which, if believed, would tend to establish that the plaintiff bought certain lots upon the agreement that the vendor would convey them by a good and merchantable title, and that to be assured of such a title the plaintiff employed the defendants to examine the records and ascertain the state and quality of the title; and that, in reliance upon the representation by the defendants to him that the title was good and merchantable, the plaintiff paid the agreed purchase price to the vendor, and had the title conveyed to a third party, the nominee of the plaintiff. The title was not in fact good and merchantable, and the plaintiff's ignorance that the vendor had no title to the lots purporting to be conveyed by the vendor and his wife, and his completion of his contract of purchase by the payment of the purchase price to the vendor, were directly caused by the breach by the defendants of their contract of

468

examination and report to the plaintiff of the state of the vendor's title. The purchase price paid was a substantial amount, and the plaintiff thereupon became entitled to recover the loss or injury occasioned as the proximate result of the breach.

In the case of a total failure of title to land purporting to be conveyed, the measure of damages suffered by the purchaser, whether the title was conveyed to the purchaser or his nominee, (a) would ordinarily include the full amount of the purchase price paid by the purchaser, and interest in the discretion of the jury. *Supra; Sutherland on Damages* (4th Ed.), sec. 593 *et seq.; Mayne on Damages,* (10th Ed.), 203; *Murphy v. Fidelity Abstract & Title Co.,* 114 Wash. 77, 194 P. 591, (a) 1 *C. J. S., Abstracts of Title,* sec. 11, subd. c. (2), p. 396; *Beckovsky v. Burton Abstract & Title Co.,* 208 Mich. 224, 175 N. W. 235, 237, 238, 178 N. W. 238; *Combs v. Eubank,* 28 Fed. 2nd, 459.

It seems generally accepted that the liability of the defendants as attorneys to examine and pass upon a title to land is founded in contract and not on tort, and, therefore, does not, as a general rule, extend beyond the person by whom they were so employed. So, when the party with whom the contract is made is the purchaser, and he causes the title to the land, after paying the purchase money, to be conveyed by the vendor to his nominee, the subsequent loss and injury sustained by such nominee and his successors in the title, by reason of any defect in or absence of title, may not be recovered of the attorneys by such third parties as damages. *Warvelle on Abstracts and Examination of Titles,* sec. 619, p. 656; *Mechem on Agency,* (2nd Ed.), sec. 2213.

In fixing the measure of damages at the purchase price paid as of the time of the purporting grant of the title to the lots, there may be no further recovery against the defendants on account of the purchaser acquiring nothing by his purchase, through the breach of contract by the defendants.

So, taxes on Lots Nos. 20-25, for the years 1924 to 1935, cannot be included in the damages allowed. The lots in question were unimproved and no actual possession is established by the plaintiff or his nominees in title. If there had been such possession it would have been a trespass with the possibility of paying damages for it to the true owner. If, therefore, the plaintiff paid the taxes on the lots, while the purporting paper title was in his nominees, he paid as a volunteer, and cannot recover them of the defendants as a part of his damages. So, the tax bills mentioned were properly excluded by the court, as shown by the first bill of exceptions.

On the second, third, fourth and fifth bills of exceptions, the question raised is the propriety of the exclusion of the opinion of George M. Mullen, an attorney at law, who is experienced in the examination of titles and the preparation of abstracts, as to the validity of the title attempted to be conveyed by the deed of Fyffe for Lots Nos. 20-25, in view of proceedings and decisions of the chancellors and of the Court of Appeals in the cases of *Waring v. Stinchcomb,* 141 Md. 569, 119 A. 336 and *Stinchcomb v. Realty Mortgage Company, Inc.,* 171 Md. 317, 188 A. 790.

Whether or not the title to the lots is marketable is a question of law for the court, and the opinion of a conveyancer or lawyer on that inquiry is here inadmissible. *Maupin on Marketable Title to Real Estate,* 3rd Ed., sec. 283, pp. 773, 774.

The sixth, seventh, eighth, ninth, tenth, eleventh and twelfth bills of exceptions may be considered as a group, as the correctness of the court's rulings depends upon the same principle of proof. The offers were to read in evidence (1) the opinion of the Court of Appeals in the case of *Waring v. Stinchcomb,* 141 Md. 569, 119 A. 336; (2) the proceedings in the equity cause of *Realty and Mortgage Company, Inc. v. Stinchcomb* in the Circuit Court for Anne Arundel County, in equity, and particularly the bill of complaint, the answer, the decree,

and the mandate of the Court of Appeals; and (3) the decision of the Court of Appeals in the cause in equity of *Stinchcomb v. Realty Mortgage Company, Inc.*, 171 Md. 317, 188 A. 790.

These documents were not offered to be read as part of a record duly certified, nor as part of the original papers and proceedings in a cause in another court of the State, together with a transcript under seal of the docket entries thereon, as provided by section 70 of article 35 of the Code. In addition to the indicated formal defects in the proffer, a short copy of the (3) decision of this court in 171 Md. 317, 188 A. 790, was in evidence, and the other documents were either not matters for the jury, or were available to the court in the printed volumes of the Maryland Reports, or were proceedings subsequent to the alleged breach of the contract by the defendants.

The final exception on the testimony is the thirteenth, and it was to the refusal of the court to permit Thrift to be questioned on cross-examination as to a real estate transaction between the witness and the plaintiff in reference to a property known as 1501 Federal Street. The subject matter of the inquiry was immaterial and irrelevant.

The court finds no reversible error on the rulings on the testimony, but for error in granting the first and tenth prayers of the defendants, taking the case from the jury, the judgment must be reversed.

> *Judgment reversed, with costs to the appellant, and case remanded for new trial.*