A. E. Sieck, appellee, v. Carn Godsey and Janice Godsey Robertson, appellants.

No. 50801.

(Reported in 118 N.W.2d 555)

December 11, 1962.

Ross, Johnson, Stuart, Tinley & Peters and Kistle & Telpner, all of Council Bluffs, for appellants.

Cook & Drake, of Glenwood, and DeVere Watson, of Council Bluffs, for appellee.

THOMPSON, J.—This case comes to us by courtesy of the Missouri River and the United States Corps of Army Engineers. The engineers have been for many years engaged in an attempt to enforce some measure of law and order upon this most wandering and capricious of rivers; and in the course of their activities has arisen the situation which gives rise to the present lawsuit.

Prior to 1938 plaintiff's predecessor in title owned lands lying in the horseshoe-shaped loop formed by what was known as St. Mary's Bend in the river. At this point the river took a wide curve to the east and southeast, then curved back to the southwest, and so formed a peninsula in which lay the land owned by plaintiff's grantors. It was bounded on the north, east and south by the river, and was at the time a part of the State of Nebraska.

In 1938, following extensive preparations, which included digging a canal across the neck of the peninsula, which means on the west side, the engineers diverted the main channel of the river into the new channel and it has since flowed there. The · Iowa-Nebraska Boundary Commission has since allocated the

land lying within the former bend to the State of Iowa, and all lands involved in this litigation are now part of Mills County in this state. The controversy here concerns a part of the old bed of the river immediately east of the former west high bank of the river. The defendants own the land along the old east high bank. They deny the right of the plaintiff to claimed accretion land which he asserts has built up adjacent to the old west high bank. The trial court found the issues in favor of the plaintiff, and we have this appeal by the defendants.

It is generally the case, when accretion is claimed, and it is so here, that the dispute is largely factual. The plaintiff's evidence tends to show that after the main channel of the river was diverted to the new course, there was for a time water flowing in the old riverbed, with the chief channel through a swale lying along and immediately west of the old east high bank, where defendants' land lies. This, according to plaintiff's evidence, resulted in a deposit of sand and silt along the former west high bank, which extended to a line known in the record as Line C, located approximately along the west edge or bank of the swale. While the record is not altogether clear, it appears that the old bed of the river does not now contain water at all times, but that at times of high water there is some water in it, especially in the swale. There is evidence that the swale does not always contain running water, but that there is an intermittent stream through it much of the time.

I. The legal questions involved are not difficult. There is a considerable discussion of the location of the thread of the stream of the river as it formerly flowed around St. Mary's Bend. But as we view the factual situation this is not important and need not be determined. A study of the record convinces us that the trial court correctly evaluated it, and that the plaintiff is entitled to accreted lands as found by the trial court. This takes his ownership beyond any probable location of the thread of the stream before it was diverted to the new channel. The discussion is an interesting one, but not now profitable.

II. All parties agree that the change of the channel of the river was a man-made avulsion. But there may be accretions after an avulsion; and it does not matter that the accretions are

caused by an artificial process or means over which the riparian owner has no control and which he has no part in creating or causing. Solomon v. City of Sioux City, 243 Iowa 634, 639, 640, 51 N.W.2d 472, 476. We recognize the doctrine of accretion in Iowa. Wilcox v. Pinney, 250 Iowa 1378, 1383, 98 N.W.2d 720, 723; Solomon v. City of Sioux City, supra, loc. cit. 243 Iowa 638, 51 N.W.2d 475; Rupp v. Kirk, 231 Iowa 1387, 1388, 4 N.W.2d 264, 265.

Likewise, we have held that while an accretion to land must be gradual and imperceptible, the length of time during formation is not material. An increment which either slowly or rapidly results from floods is an accretion if it is beyond the power of identification. Holmes v. Haines, 231 Iowa 634, 642, 1 N.W.2d 746, 750; Coulthard v. Stevens, 84 Iowa 241, 245, 50 N.W. 983, 984, 35 Am. St. Rep. 304; 93 C. J. S., Waters, section 76, pages 750, 751. The foregoing principles are well established in our law, and all have application in the case at bar.

III.  A principle of the law of accretion more difficult to apply in the case at bar is thus stated in 56 Am. Jur., Waters, section 483, pages 897, 898: "In order to effect a change of boundary, formations resulting from accretion or reliction must not only be made to the contiguous land, but must operate to produce an expansion of the shoreline outward from the tract to which they adhere." It is a disputed question here whether there is now any "shoreline" remaining. The theory of accretion is that it permits a riparian owner to continue his access to the shoreline or waterline. Accordingly, if there is no shore, no water to which his access will be continued, there can be no accretion. As we view the record this is the important and troublesome point in the case. The rule is stated: "It is fundamental in the law of accretions that the land to which they attach must be bounded by the water to entitle its owner to such increase." 56 Am. Jur., Waters, section 485, page 898.

The weight of evidence here indicates that there was a definite swale or depression along the old east bank of the former channel, that it was the principal swale in the old bed of the river, and that water ran in it at certain times of the

year. For the defendants, James K. Godsey testified: "As shown by Exhibit 6, there has been sufficient fill put in against what I denoted as the old west bank so that what water is going through goes through the end of trail dike 642.3 coming around in the swale against the old east high bank. * * * It could have been running; if the river was high enough it probably was. The river had to be high enough so that the water was getting through this revetment." Another defendants' witness said: "At the time this aerial map was made there was some water in it [the swale in question], not running. At certain times of the year there would be water running down through there, that's true. There is an intake and there would be an outlet, with every little stream, but you can't hardly call it a stream this time I'm talking about without water. What I mean to say there was some water, there was some puddles. It is a fact that when the Missouri River got to a certain point the water entered this chute from the Missouri River and flowed through that chute or swale all the way around what has been referred to as Schiefelbein Island, and back into the Missouri River, but not in November."

The plaintiff's evidence tended to show more water, and more running water, going through the swale than did this testimony of the witnesses for the defendants. We think the weight of the evidence is that there was an intermittent stream going through the swale, sufficient to constitute a watercourse. In 56 Am. Jur., Waters, section 8, page 498, it is said: "It has been stated that surface water becomes a natural watercourse at the point where it begins to form a reasonably well-defined channel, with a bed and banks, or sides and current, although the stream itself may be very small and the water may not flow continuously." The definition of a natural watercourse in 93 C. J. S., Waters, section 3, page 596, is this: "The term has been frequently defined by the courts, and as so defined a 'natural watercourse' is one made by the natural flow of the water caused by the general superficies of the surrounding land from which the water is collected into one natural channel; a living stream with defined banks and channel, not necessarily running at all times, but fed from other and more permanent sources than

mere surface water; * * *." The swale along the former east high bank meets these specifications. In fact, it forms a considerable channel some 125 feet or more in width according to the testimony.

■ IV. Another question, entirely factual, is whether there was in fact a buildup from the old west high bank, following the change of the course of the river, across to the western boundary of the swale above referred to which runs along the former east high bank. This was the finding of the trial court. William A. Hager, a consulting civil engineer and forester, the only expert who testified in the trial, as a witness for the plaintiff said from an examination of aerial photographs and after a field survey of the old riverbed, that in his opinion there was a buildup of soil commencing with the old west high bank and extending to a line C on the map, which is approximately the west line or bank of the swale adjacent to the former east high bank. Fay H. Schiefelbein, the former owner of the land in place which he sold to the plaintiff, testified to the same effect. The substance of his testimony tends to show that after the change in channel of the river the old riverbed was still covered with water, which gradually subsided as the new channel became enlarged and capable of carrying the greater part of the river's flow. His land, which he then owned, was left as an island, known as Schiefelbein's Island. He sometimes reached it by boat, but took livestock and machinery to it by going to the land of the defendants and another on the old east high bank and crossing from there. At first he had to go through some water all the way; but, due perhaps to the revetments and dikes built by the engineers in diverting the course of the river, there was a gradual buildup of silt and sand along the old west high bank. Most of this took place in the years immediately following the change in the river channel, but it had continued to some extent in later years.

There are several aerial photographs and maps of the old riverbed showing the changes that have taken place since the diversion of the river channel. Accretion is a subject which lends itself readily to disputed questions of fact and honest differences of opinion as to when, where, and how much of it has

taken place. But we think the weight of the evidence supports the trial court's findings of fact; and we are of course aided by the rule that in equity cases we give weight to the findings of the trial court.

V. The defendants cite and rely upon Wilcox v. Pinney, supra. We do not find it in point. In that case there had been a complete erosion of the plaintiff's land. The river had shifted to the Iowa side, then moved back to its former location. In shifting eastward it had eroded plaintiff's land. The question in the case was as to plaintiff's ownership of the land which had been covered by the river in its eastern shift, after it again moved west. In particular, there was a question whether an island had at all times been above the surface of the water or had been submerged and eroded with the remainder of plaintiff's realty. We find no factual similarity in the two cases.

VI. The defendants urge that the plaintiff must recover on the strength of his own title. This is correct. But we have held above that he has proven his title.

We conclude the trial court was correct in its decision of the case.—Affirmed.

All Justices concur.