STEINEM ET UX. *v.* ROMNEY ET AL.

[No. 41, September Term, 1963.]

*Decided November 12, 1963.*

*Motion for rehearing filed and denied December 11, 1963.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT, HORNEY, MARBURY and SYBERT, JJ.

*William O. E. Sterling* for appellants.

*William E. Brooke,* with whom were *Shriver & Brooke* on the brief, for appellees.

SYBERT, J., delivered the opinion of the Court.

This is an appeal by Lester H. Steinem and his wife, defendants below, from a decree of the Circuit Court for St. Mary's County which declared that title to a sandbar in the Patuxent River is vested in the plaintiffs-appellees, Dorothy C. Romney, Oran R. Wilkerson and his wife, and John F. Gross and his wife, and which granted other relief. In a previous appeal by the plantiffs we held that this suit was properly cognizable in equity. See *Romney v. Steinem,* 228 Md. 605, 180 A. 2d 873 (1962).

In 1918 the appellees, John F. Gross and wife, acquired a tract of land known as "Kingston", containing 200 acres, more or less, from the parents of the husband. This tract fronted on the south shore of the Patuxent River, a navigable stream, and was bounded on the west by Little Kingston Creek and on the east by Big Kingston Creek, also called St. Nicholas Creek. By mesne conveyances the westerly portion of the river frontage of the tract was conveyed to the appellee, Mrs. Romney, and the

center portion to the appellees, the Wilkersons. The easterly portion of the river frontage and the balance of the farm were retained by the Grosses.

A tract of land known as The Beach or the Levering Land, also fronting on the south shore of the Patuxent River, lay to the east of the Gross tract and Big Kingston Creek, the center of that creek being the common boundary between the two tracts. On March 26, 1923 part of the Levering tract was subdivided as "Levering's Subdivision No. 1 of Patuxent Beach", a plat of which was recorded among the land records. Lot 24 of this subdivision, which is bounded on the west by Big Kingston Creek and on the north by the Patuxent River, was conveyed by mesne conveyances to the appellants, Lester H. Steinem and his wife, in 1946.

John Gross testified that he has lived on his property since 1903. He said that when he purchased it from his father in 1918 there was a submerged sandbar in the Patuxent River which ran along the front of his property. He also stated that the original channel leading to the Patuxent River from Big Kingston Creek ran in a northerly direction between the property now owned by the appellants and that portion of the Gross tract which he has retained, and that the mouth of the channel was about 20 feet wide. The sandbar was submerged about two inches below the water, but where Big Kingston Creek flowed into the Patuxent, the water was two to three feet deep. Gross testified that he had often driven his wagon and team onto the submerged sandbar, and thence easterly across the mouth of the creek and along a beach in front of the Levering tract to Spencer's Wharf, where he purchased feed for his livestock. He said that when he went from the mainland to the bar the water did not reach the hubs of his wheels. In the 1920's a heavy storm caused the sandbar to appear above water, forming a small island. Over the years the sandbar gradually expanded at each end so that it eventually extended along the whole frontage of the Gross tract, including the portions now held by Mrs. Romney and the Wilkersons. Another storm in 1933 added to its size. The bar has been used by the appellees and their predecessors for many years for a variety of purposes, including swimming, fishing, crabbing and picnicking.

Gross stated that he had built fences across the bar to keep his cattle in.

The testimony of William B. Long, called by the plaintiffs, supported that of Gross. He said he had known the property since 1908, and recalled that the channel to Big Kingtson Creek ran along the bank of what is now the appellants' property. He, too, said that the original mouth of the channel was not over 20 feet wide, and that a storm in the 1920's closed it and deflected the stream so that it then ran between the appellees' properties and the sandbar. Mrs. Romney testified that as the bar grew in front of what is now her property, her father, who then owned it, put up a jetty and steps and in 1929 erected a bridge to the bar, which remained until after his death in 1941. Wilkerson testified that when his wife's parents acquired what is now his property in 1931 there was a bridge from it to the sandbar, and that there were also bridges from the present Romney and Gross properties to the bar. He said he later relocated his bridge, which is still there, and that the steps to the Romney bridge and the supports to the Gross bridge are still in place.

The Chancellor found that as the sandbar elongated in an east-west direction, the eastern portion became attached to the land now owned by the appellants after storms in the 1920's and 1930's, closing the mouth of Big Kingston Creek and deflecting the narrow channel of the stream so that instead of continuing in a northerly direction between the Gross and Levering tracts directly into the Patuxent River, it flows between the sandbar and the appellees' properties in a westerly direction and empties into the Patuxent where Little Kingston Creek and the river join. Thus, as conditions exist today, the sandbar is attached to the property of the appellants where the original mouth of Big Kingston Creek was located.

Steinem's testimony indicates that in 1956, well after the sandbar had connected itself to his beach, he became annoyed because Gross refused to keep seiners and other people off the sandbar as requested by him, because they "created nuisances". Thereafter, in an attempt to gain control over the sandbar, the Steinems made a contract to sell the entire sandbar to a friend,

Lawrence I. Peak. Apparently as agreed, Peak refused to go through with the contract and the Steinems brought suit for specific performance, which was granted by decree of the Circuit Court for St. Mary's County on October 4, 1956 (in Equity case no. A-803). The Steinems then conveyed the bar to Peak on November 6, 1956 and Peak reconveyed it to the Steinems on November 16, 1956. None of the appellants was made a party to or appeared in the specific performance suit, and it appears that they had no notice of the suit until after its completion.

In 1960 the appellee, Mrs. Romney, contracted to sell to J. Howard Joynt and wife (also appellees here) her portion of the Gross tract, including in the description of the property that part of the sandbar which had accreted in front of her property. The Joynts refused to perform the contract on the basis that Mrs. Romney could not convey good title because of the title cloud as to the sandbar resulting from the 1956 decree and the Peak deeds. The description in the deed to the Wilkersons also includes the portion of the sandbar which lies in front of their property. Mrs. Romney and the Wilkersons filed a bill of complaint in the court below against the Steinems (the appellants), the Grosses, and the Joynts. The Grosses were later made plaintiffs. The bill sought a declaration that title to the accreted sandbar was vested in the appellees to the extent that it was within the properties occupied by them, and a decree removing the cloud cast upon the appellees' title to the sandbar by the 1956 decree for specific performance and the Peak deeds. In addition, Mrs. Romney prayed specific performance of her contract of sale with the Joynts. After answers were filed by the defendants and testimony was taken (as previously indicated), the Chancellor signed a decree granting the relief prayed. The Steinems appealed.

It is manifest that the 1956 equity decree for specific performance between the Steinems and Peak is not decisive with respect to the title to the sandbar as between the Steinems and the appellees, who were not parties, or in privity with a party, to the prior proceeding. *Res judicata* is not applicable. Cf. *Crouch v. Mercantile, etc. Co.,* 220 Md. 140, 151 A. 2d 757 (1959) ; *Safe Dep. & Tr. Co. v. Strauff,* 171 Md. 305, 189 Atl.

195 (1937); *Mullikin v. Hughlett,* 142 Md. 539, 121 Atl. 244 (1923).

The decisive question before us is whether the Chancellor properly held that title to the sandbar is in the appellees to the extent that it is within the properties occupied by them. A review of the evidence reveals little meaningful dispute as to the salient facts, and we think that the Chancellor's findings of fact were not clearly erroneous, Maryland Rule 886a, and that he correctly applied the law to the facts as he found them to exist.

Chapter 129 of the Acts of 1862 was passed, according to its preamble, to resolve doubts "in regard to the extent of the rights of proprietors of land bounding on navigable waters, to accretions to said land, and to extend improvements into said waters." Two of the sections of that Act are now codified as Secs. 45 and 46 of Art. 54, Code (1957), and read as follows:

> "§ 45. The proprietor of land bounding on any of the navigable waters of this State shall be entitled to all accretions to said land by the recession of said water, whether heretofore or hereafter formed or made by natural causes or otherwise, in like manner and to like extent as such right may or can be claimed by the proprietor of land bounding on water not navigable.
>
> "§ 46. The proprietor of land bounding on any of the navigable waters of this State shall be entitled to the exclusive right of making improvements into the waters in front of his said land; such improvements and other accretions as above provided for shall pass to the successive owners of the land to which they are attached, as incident to their respective estates. But no such improvement shall be so made as to interfere with the navigation of the stream of water into which the said improvement is made."

Both below and here all parties to the case proceeded upon the assumption that the newly formed land now in dispute was formed by accretion, and consequently we shall do likewise. So considering the sandbar, we think that the appellees became en-

titled to it under the statute. This Court has held that Sec. 45 (then Sec. 47) of the statute, giving to the proprietor of land bounding upon any navigable stream all accretions to such land, applies regardless of whether the accretions start at the shore and extend outward to the channel, or start at the channel and extend inward to the shore. *Melvin v. Schlessinger,* 138 Md. 337, 113 Atl. 875 (1921). The fact that the sandbar is connected to the appellants' land but does not actually touch the land of the appellees does not give the Steinems title to the entire sandbar, since the bar extends as far westward as the mouth of Little Kingston Creek and lies directly in front of the properties of the appellees. *Waring v. Stinchcomb,* 141 Md. 569, 119 Atl. 336 (1922).

In an aerial photograph of the area in question, introduced in evidence by the appellants, the sandbar has the appearance of a beach in front of the properties of the appellees, with the narrowest part of the formation appearing at the northwest corner of the Steinem lot, where the witnesses Gross and Long placed the original mouth of the Big Kingston Creek channel. It seems obvious that the pressure from the channel has kept the accretion at a minimum at this point. The creek, deflected to the west at the same point, is shown as a narrow stream running along the embankment of the appellees' properties to the mouth of Little Kingston Creek. From the photograph, it would seem to appear that if the stream had not been deflected the beach or sandbar would have been physically joined, above water, to the foot of the appellees' embankment.

In *Waring v. Stinchcomb, supra,* this Court was called upon to deal with a situation very similar to the one now before us. In that case the plaintiffs and defendants owned adjoining properties fronting on the west side of the Chesapeake Bay, with the Magothy Creek (Little Magothy River) running between them as their common boundary. Sand deposited by the wind and waves gradually extended from the defendants' land laterally across the front of the property of the plaintiffs, closing the original mouth of the creek and forcing the stream to flow along the property of the plaintiffs and thence into the bay. Both the plaintiffs and the defendants asserted title to the sandbar thus formed, the defendants basing their claim upon

the fact that the newly formed land was attached to their property and was separated from the plaintiffs' land by the narrow, deflected stream. In rejecting that contention, this Court quoted with approval the statement by the Supreme Court of Minnesota in *Lamprey v. Metcalf,* 52 Minn. 181, 53 N. W. 1139 (1893), of the reason for the rule giving accretion and relictions to the riparian owner, namely, "* * * to preserve the fundamental riparian right—on which all others depend, and which often constitutes the principal value of the land—*of access to the water."* (Emphasis added in *Waring.*) In holding that the plaintiffs were entitled to the formations in front of their property, this Court said (at p. 582 of 141 Md.) : "To hold that the land involved in this case belonged to the appellants [defendants] would entirely exclude the appellees from the bay, at least to the extent the land has formed off their shore, and would deprive them of their riparian rights in respect thereto. It would sandwich the appellants between them and the bay, and would not only be in conflict with the rule above laid down, which is generally accepted by the courts of this country (*Crandall v. Allen,* 118 Mo. 403), but it would deprive the appellees of the right given them by statute to build out in the water in front of their land. Code, art. 54, sec. 48 [now sec. 46]." Cf. *Melvin v. Schlessinger, supra; Linthicum v. Coan,* 64 Md. 439, 2 Atl. 826 (1886) ; *Goodsell v. Lawson,* 42 Md. 348 (1875).

We think that the reasoning and the result in *Waring* are controlling in the closely similar situation here present. No question was raised by any of the appellees as to the manner in which the Chancellor divided the sandbar between them, and therefore that issue is not before us. See 93 C.J.S., *Waters,* Sec. 76, at p. 751; 56 Am. Jur., *Waters,* Sec. 494, at p. 906, and cases cited.

The appellants raised one other question. They contend that the Grosses and Wilkersons have no riparian rights with respect to the Patuxent River. They base this contention on an apparently "home-made" contract of sale entered into in 1922 between the Grosses and one A. C. Lynn (a predecessor in title of Mrs. Romney). According to this contract and an accom-

panying rough plat, and a later deed to Lynn, when the Grosses conveyed what is now the Romney property to Lynn, they also conveyed the entire frontage of the Gross tract on the Patuxent River, as far east as the old mouth of Big Kingston Creek. On the basis of the deed and plat, the appellants concede that under the *Waring* case, *supra,* Mrs. Romney has title to the accreted strip of land in front of the property which she now holds, but contend that the remainder of the accreted strip of land, from the eastern line of Romney to their property, has accreted to their land and thus the title is in them and not in the Grosses and Wilkersons, as decreed by the Chancellor. But the problems which the Lynn contract, plat and deed might have caused in the present case were eliminated by a recorded agreement entered into in 1926 between the Grosses and DeWitt C. Croissant and wife (subsequent owners of the Lynn tract and predecessors in title of Mrs. Romney), embodying a survey which corrected the boundary between the Gross and Croissant properties so as to leave the Grosses with considerable river frontage. Subsequently, in 1931, the Grosses conveyed a portion of this frontage, adjoining the Croissant (now Romney) tract, to the Wilkersons' predecessors, and the Grosses still own the balance of the river frontage. Thus the appellants' contention that the Wilkersons and the Grosses are without riparian rights is not tenable. Indeed, it would seem that the appellants' concession with respect to the Romney property must be taken as equally effective in favor of the Gross and Wilkerson properties.

For the reasons stated, we will affirm.

> *Decree affirmed; appellants to pay the costs.*