500 A.2d 665

**Dale Randolph RAYNE, et ux.**

**v.**

**Franklin P. COULBOURNE, et ux.**

**No. 2, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

Dec. 4, 1985.

352

Ronald G. Rayne (Perdue, Rayne & Davis, P.A., on brief), Salisbury, for appellants.

John E. Jacob, Jr., Salisbury, for appellees.

Argued before GILBERT, C.J., and WILNER and AL-PERT, JJ.

ALPERT, Judge.

It has been said that "time and tide wait for no man." In this "riparian rights" case, man has awaited the effect of the tide, *i.e.*, man has waited sixteen years for a decision as to the legal effect that tide has on the boundaries of his real property. In October, 1969, Dale and Hilda Rayne, appellants, filed suit in the Circuit Court for Wicomico County against Franklin and Frances Coulbourne, Caroline Blades, H. Gray and Shirley Reeves, Larmar Corporation, John and Althea Willin, and the State of Maryland, seeking an equitable share of an artificially created peninsula that basically cut off their former frontage on the Wicomico River. The matter was eventually heard by Judge Richard M. Pollitt on a Stipulation of Facts which in relevant part stated:

> Dale Randolph Rayne and Hilda Taylor Rayne, his wife ("Rayne") and Franklin P. Coulbourne and Frances Anne Coulbourne, his wife ("Coulbourne") are the owners of adjoining tracts of land on the northerly side of Riverside Drive in Camden Election District of Wicomico County, Maryland....

> In the fall of 1951 the Army Corps of Engineers let a contract and did in fact dredge the Wicomico River and by the deposit of spoils from the dredging created a peninsula approximately eight (8) acres in size located between the original fastland ("fastland") of Coulbourne, Rayne, Caroline Blades and the State of Maryland and the main body of the Wicomico River, separated from the fastland by tidal flats and marsh in which area the tide did then and does now ebb and flow. The land was

created by the erection of a dike (berm) which was attached at one end of the northeasterly portion of the Coulbourne fastland, extending therefrom southwesterly to the rear of the fastland owned by Rayne, Blades and the State of Maryland, then circling and reversing itself and attaching at the other end to land to the east of the Coulbourne fastland then belonging to Dr. John Willin.

The following diagram, which was annexed as an exhibit to the Stipulation, better illustrates the location of the properties in question.

The land formed by accretion is shown as parcel One (p. 1). The fastland of Coulbourne, Rayne, Caroline Blades and the State of Maryland is shown as parcels Two (p. 2), Three (p. 3), Four (p. 4) and Five (p. 5), respectively.

In the Stipulation and at trial, appellants claimed "... that as a riparian owner [they] are entitled to a portion of

the land created by dredging ..." and also "the portion should be determined by a court of equity based on the doctrine of equitable apportion...." The trial judge framed the issue as:

> "whether plaintiffs are entitled to a portion of land created by dredging operations conducted by the Army Corps of Engineers where the land is separated from plaintiffs' original lot by an area in which the tide ebbs and flows."

He answered "in the negative," holding on August 27, 1982, "... on the limited facts set forth in the Stipulation that the Raynes have not been deprived of any riparian rights which they previously enjoyed." In this [1] appeal appellants contend that:

> I. As riparian owners, the Raynes were entitled to a portion of land created by the U.S. Army Corps of Engineers by depositing spoils between their land and the main body of the Wicomico River.
>
> II. The attachment of the land created by depositing of spoils to Coulbournes' riparian property and the separation of the land in dispute from Raynes'

---

1. An "untimely" appeal was noted but was dismissed by a three-judge panel of this court on May 20, 1983, for failure to comply with then Maryland Rule 605 a (now Rule 2–602) because "... there has been no adjudication to the rights of the State, Caroline Blades, H. Gray Reeves or Larmar Corporation." *Rayne et ux. v. Coulbourne et ux.,* No. 1444, September Term, 1982. The three judge panel observed that:

> [I]n 1975 the Raynes filed a motion to dismiss without prejudice. That motion was amended by Judge Pollitt. He added to the order of dismissal the words, "unless one or more defendants file objections within 30 days hereof, and upon payment of costs by plaintiff." The Coulbournes and Blades objected. Thus, all parties remained in the case even though they were treated as if they were no longer defendants. Obviously aware that he could not adjudicate the rights of absent parties, Judge Pollitt carefully limited his holding to the Raynes and the Coulbournes.

> Without unduly burdening this opinion with the rather unusual proceedings which followed in the Circuit Court for Wicomico County, we are satisfied that the remaining parties abandoned whatever interest they had in the case and are not necessary parties to this appeal. In any event, they can hardly complain as our limited holding does not adversely affect them.

riparian property by tidal flats and marsh in which the tide ebbs and flows are immaterial.

III. The Raynes' claim should not be denied on "equitable principles."

We believe that issues I and II, as framed by appellants, are really nothing more than a bifurcated version of the issue framed by the trial court, *i.e.*, "whether plaintiffs are entitled to a portion of land created by dredging operations conducted by the Army Corps of Engineers when the land is separated from plaintiffs' original lot by an area in which the tide ebbs and flows." Our review of the trial court's opinion indicates that its holding "in the negative" was based on two legal conclusions which were determinative of the outcome of the litigation. They were:

(1) The general rule, that a riparian owner is entitled to all natural accretions to his land, does not apply in this case where the peninsula was formed by artificial accretion; and

(2) The Raynes' riparian right of access to water was unaffected by the Coulbournes' claim of title to the peninsula, because the evidence does not show the Raynes' ability to reach the Wicomico River was diminished by the Coulbournes' possession of the peninsula.

It is our opinion that both of these conclusions of law were erroneous and materially affected the outcome of the suit. Therefore, we shall reverse and remand this case to the trial court for further proceedings.

The rights of a riparian owner have long been established in the common law of this State.[2] As early as 1829, the Court of Appeals held

that where a tract of land lies adjacent or contiguous to a navigable river or water, any increase of soil formed by

---

**2.** For an excellent and comprehensive discussion of the development of riparian rights, *see Board of Public Works v. Larmar Corp,* 262 Md. 24, 277 A.2d 427 (1971).

the waters gradually or imperceptibly receding, or any gain by alluvion in the same manner, shall, as a compensation for what it may lose in other respects, belong to the proprietor of the adjacent or contiguous land.

*Giraud v. Hughes*, 1 G & J 249, 264 (1829). As aptly delineated by the Supreme Court, there are a number of reasons supporting the doctrine of accretion.

First, where lands are bounded by water, it may well be regarded as the expectancy of the riparian owners that they should continue to be so bounded. Second, the quality of being riparian, especially to navigable water, may be the land's 'most valuable feature' and is part and parcel of the ownership of the land itself.... Riparianness also encompasses the vested right to future alluvion, which is an 'essential attribute of the original property.' *County of St. Clair v. Lovingston*, 23 Wall. 46, 68 [23 L.Ed. 59] (1874). By requiring that the upland owner suffer the burden of erosion and by giving him the benefit of accretions, riparianness is maintained. Finally, there is a compensation theory at work. Riparian land is at the mercy of the wanderings of the river. Since a riparian owner is subject to losing land by erosion beyond his control, he should benefit from any addition to his lands by the accretions thereto which are equally beyond his control.

*Bonelli Cattle Co. v. Arizona*, 414 U.S. 313, 326, 94 S.Ct. 517, 526, 38 L.Ed.2d 526 (1973) (overruled on other grounds in *Oregon v. Corvali Sand & Gravel Co.*, 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977)) (citations and footnote omitted). Hence, the owner of fast land has a common law right to any accretion adjacent thereto and the right of access to the navigable water bounding his fast land. *Causey v. Gray*, 250 Md. 380, 387, 243 A.2d 575 (1968). The owner also enjoys "the right to make a landing, wharf or pier in front of his fast land,[3] subject, however, to general

---

**3.** At early common law, however, the riparian owner had no right to make improvements into the water bounding his property. *See Mel-*

rules and regulations imposed by the public authorities necessary to protect the rights of the public." *Id. See also Baltimore & Ohio Railroad v. Chase,* 43 Md. 23, 35 (1875).

While the riparian owner was entitled to accretions to his property, *see Linthicum v. Coan,* 64 Md. 439, 2 A. 693 (1886), the State was and is deemed the owner of lands located under navigable waters. *Board of Public Works v. Larmar Corp.,* 262 Md. 24, 35, 277 A.2d 427 (1971). Indeed, the State could grant a patent to submerged land to a person other than the riparian owner and, in all practicality, destroy the riparian nature of the property. *Linthicum v. Coan,* 64 Md. at 453, 2 A. 693. The Acts of 1862 [4] ended this practice by prohibiting "the granting of patents that will impair or affect such rights of the riparian owners; and whether those rights have been impaired or affected by the issuance of a patent is largely to be determined upon the facts and circumstances of each case." *Melvin v. Schlessinger,* 138 Md. at 343–44, 113 A. 875. Hence, the trial court noted that the Act of 1862

> materially enlarged the rights [5] of proprietors of land bounding on navigable waters. *Goodsell v. Lawson,* 42 Md. 348 [, 371] (1875); *Bowie v. Western Maryland Railway Terminal Company,* 133 Md. 1 [, 10, 104 A. 461] (1918); *Melvin v. Schlessinger,* 138 Md. 337 [, 340, 113 A. 875] (1921); *Causey v. Gray,* 250 Md. 380 [, 388, 243 A.2d 575] (1968). The riparian owner's rights were secured by that statute to an extent beyond what the common law

---

*vin v. Schlessinger,* 138 Md. 337, 340, 113 A. 875 (1921). The Act of 1862, *see* Note 4, *infra,* granted riparian owners the exclusive right to make improvements in front of their property. 138 Md. at 343, 113 A. 875.

**4.** Acts of 1862, Ch. 129, §§ 37–39 (repealed by Acts of 1970, Ch. 241, § 2) (herein referred to as "Act of 1862").

**5.** *See, e.g.,* Md.Code Ann. Art. 54 § 48, which provided:
> No patent hereafter issued out of the Land Office shall impair or affect the rights of riparian proprietors, as explained and declared in §§ 45 and 46; and no patent shall hereafter issue for land covered by navigable waters.

allowed, even according to the largest definition of those rights under the law. *Garitee v. Baltimore*, 53 Md. 422 [, 432] (1880).

Part of the Act of 1862 was codified as Md.Code Ann. Art. 54 § 45 (1957, 1968 Repl.Vol.), which provided:

> The proprietor of land bounding on any of the navigable waters of this State shall be entitled to all accretions to said land by the recession of said water, whether heretofore or hereafter formed or made by *natural causes or otherwise*, in like manner and to like extent as such right may or can be claimed by the proprietor of land bounding on water not navigable.

(Emphasis added). In addition, Section 46 provided:

> The proprietor of land bounding on any of the navigable waters of this State shall be entitled to the exclusive right of making improvements into the waters in front of his said land; such improvements and other accretions as above provided for shall pass to the successive owners of the land to which they are attached, as incident to their respective estates. But no such improvement shall be made as to interfere with the navigation of the stream of water into which the said improvement is made.

These two sections were repealed in 1970 by the Wetlands Act [6] and the comparable section now appears at Md.Nat. Res.Code Ann. § 9–201(a) (1983 Repl.Vol.) and provides, in pertinent part:

> A person who is the owner of land bounding on navigable water is entitled to any *natural* accretion to his land, to reclaim fast land lost by erosion or avulsion during his ownership of the land to the extent of provable existing boundaries. The person may make improvements into the water in front of the land to preserve that person's access to the navigable water or protect the shore of that

---

6. For an excellent discussion of the Wetlands Act and its effect on filling operations, *see Board of Pub. Works v. Larmar Corp.*, 262 Md. 24, 277 A.2d 427 (1971).

person against erosion. After an improvement has been constructed, it is the property of the owner of the land to which it is attached.[7]

(Emphasis added).

### (1)
### *Artificial vs. Natural Accretion*

■ The italicized language in the Act of 1862 and the Wetlands Act presents a crucial distinction we must address before deciding whether artificial accretions should be afforded the same legal effect as natural accretions. In its opinion, the trial court noted:

> [n]either counsel has addressed the question of what, if any, effect the repeal of § 45 and the enactment of § 9–201 has on the issue in this case. Certainly the peninsula is an 'artificial', not natural, accretion. Neither party exercised any rights of ownership, either riparian or otherwise, prior to the enactment of 9–201. We recognize that an additional issue might exist in this regard, but we are not called upon to, and therefore will not, consider it.

There is no dispute that the land in question was formed by the process of accretion, and that the accretion was effected, or at least assisted, by artificial means. This "Wetlands Act issue" is therefore one which must be addressed, as it is dispositive of the case before us. If the Wetlands Act was the applicable law below, the appellant's argument would fail solely because they have no claim to accretion that is not "natural."

We need look no further than the Wetlands Act, which in pertinent part provides that:

> ■ riparian owner may not be deprived of any right, privilege, or enjoyment of riparian ownership that he had prior to July 1, 1970.

---

7. Section 9–201 has been revised on two occasions since its initial codification; however, the changes have not been substantive, *i.e.*, they related only to the choice of language.

Md.Nat.Res.Code Ann. § 9–103 (1983 Repl.Vol.). Because there is no dispute that the land in question formed prior to July 1, 1970,[8] then the Act of 1862 is the controlling law in the present case.

The next step is necessarily to ascertain whether the Act of 1862 contemplated any distinction between natural and artificial accretion. The italicized language from the Act of 1862, *supra,* refers to accretion "formed or made by *natural causes or otherwise."* Recognizing that the words "or otherwise" cause the reach of the statute to be patently ambiguous,[9] construction is required. *State v. Intercontinental, Ltd.,* 302 Md. 132, 486 A.2d 174 (1985).

In *Board of Public Works v. Larmar Corp.,* 262 Md. 24, 277 A.2d 427 (1971), the Court of Appeals addressed this ambiguity in the Act of 1862. There, the court was faced with, *inter alia,* the issue of whether a riparian owner was entitled, under the Act of 1862, to accreted lands which had been artificially created by him.[10] The court acknowledged that artificial fill "was not within the established meaning of accretion, as it was known at common law." *Id.* at 40, 277 A.2d 427 (citations omitted). It then proceeded to examine the intents and purposes behind the Act of 1862,

---

**8.** Prior to July 1, 1970, the riparian right to reclaim lands formed by accretion or reliction vested when the accretions were formed, *i.e.,* became *terra firma. See Causey v. Gray,* 250 Md. 380, 243 A.2d 575 (1968); *Linthicum v. Coan,* 64 Md. 439, 2 A. 693 (1886); *Giraud v. Hughes,* 1 G & J 249 (1824).

**9.** *See Board of Public Works v. Larmar Corp.,* 262 Md. 24, 40, 277 A.2d 427 (1971), quoting from Salsbury, *Maryland's Wetlands: The Legal Quagmire,* 30 Md.L.Rev. 240, 247:
  Further ambiguities arise from the wording "accretion * * * made by natural causes or otherwise." Since at common law accretions could only be formed by natural causes, [*Linthicum v. Coan,* 64 Md. 439, 450–452, 2 A. 693 (1886) ] it is unclear what accretions "made * * * otherwise are...."

**10.** After obtaining a permit from the Army Corps of Engineers, the riparian owner in *Larmar* had filled contiguous marshland by enclosing the area to be filled with bulkheads and pumping earth fill (dredged from the bay bottom) into the enclosure.

quoting extensively from Professor Power's *Chesapeake Bay in Legal Perspective*, U.S. Dept. of Interior (1970), which in pertinent part states:

> The language used in Section 45 and 46 [Act of 1862] would seem to be broad enough to embrace artificial landfill projects. Section 45 provides that owners of land bounding on navigable waters shall have the same rights to accretions by virtue of recession of waters from either natural causes or 'otherwise,' as do owners of land bounding on non-navigable streams. Since it had been resolved prior to 1862 that owners of land bounding on non-navigable waters were entitled to accretions, the apparent intent of the statute was to give navigable riparian owners on navigable waters the same rights. Although the syntax of Section 45 leaves something to be desired, that natural increases in the shoreline (accretions) be treated interchangeably with man-made increases appears to have been intended. This construction is buttressed by the language of Section 46, which lumps together 'improvements' with 'other accretions' and provides that they shall all belong to the abutting riparian land owners.

*Id.* at 100–101, quoted in *Larmar*, 262 Md. at 43, 277 A.2d 427. In addition, the court cited several cases [11] which construed the Act as vesting exclusive rights in the riparian owner to make improvements on all the soil of the water in front of his land. In light of this precedent, the *Larmar* court concluded "that the riparian owner under the Act of 1862 had the right to make artificial landfill in navigable waters in front of his shore, limited only to the extent that he could not obstruct navigation."

The *Larmar* holding, however, is not singularly conclu-

---

**11.** *See Larmar,* 262 Md. at 40–41, 277 A.2d 427, *citing Causey v. Gray,* 250 Md. 380, 243 A.2d 575 (1968); *Baltimore v. Canton Co.,* 186 Md. 618, 625, 47 Md. 775 (1946); *Hodson v. Nelson,* 122 Md. 330, 337–41, 89 A. 934 (1914); *Western Md. Tidewater R.R. v. Baltimore,* 106 Md. 561, 565–66, 68 A. 6; *Goodsell v. Lawson,* 42 Md. 348 (1825).

sive on the question of whether *lands*,[12] which have accreted through artificial means *without* the control of the upland owner, are within the scope of the Act. This being an issue of first impression in this State, we must look elsewhere to determine how courts have handled this natural-artificial distinction.

In the majority of jurisdictions that have been faced with this issue, it has generally been held that it is immaterial whether the deposits causing the new land derived from natural causes or had an artificial impetus so long as the deposits were gradual. *Bonelli Cattle Co. v. Arizona*, 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973); *see, e.g.,* *Schafer v. Schnabel*, 494 P.2d 802 (Alaska 1972) (deposits formed upstream of clay that had been dumped on seaward border of plaintiff's land by defendants); *Sieck v. Godsey*, 254 Iowa 624, 118 N.W.2d 555 (1962) (project by Army Corps of Engineers caused accretion on plaintiff's land adjacent to Missouri River); *Adams v. Robertson*, 97 Kan. 198, 155 P. 22 (1916) (accretion influenced by a bridge and protective embankment which had altered current of river); *Adams v. Frothingham*, 3 Mass. 352 (1807) (accretion partially the result of the erection of wharves). *See generally* Annotation, 63 A.L.R.3d 249 (1975). The oft-cited Supreme Court case, *County of St. Clair v. Lovingston*, 90 U.S. (23 Wall) 46, 23 L.Ed. 59 (1874) is especially helpful here. There, as in the case *sub judice*, the issue concerned accreted land attributable to the erection by third persons of upstream dikes, which changed the current and accelerated deposits. Rejecting the argument that artificially effected accretions were not within the common law rule, the Court said:

---

**12.** The cases and commentators cited in *Larmar* concerned improvements such as wharves, piers, landings, and, in the *Larmar* case, an earthfilled marshland which was filled for the purpose of constructing a real estate development. Those cases are factually distinguishable from the case *sub judice* where the land was not an "improvement" created with any obvious real estate interest in mind, but rather was created inadvertently as the result of government action.

The proximate cause was the deposits made by the water. The law looks no further. Whether the flow of the water was natural or affected by artificial means is immaterial.

*Id.* at 66.

Considering those authorities, and Maryland case law holding that the Act of 1862 does not abridge, but only enlarges the riparian owner's common law rights, *Linthicum v. Coan*, 64 Md. 439, 453, 2 A.693; *Garitee v. Mayor and City Council of Baltimore*, 53 Md. 422, 437, we believe that the Act of 1862 contemplated no distinction between accretions formed naturally and those formed by artificial means.

The facts of the instant case demonstrate further the unjust result of such a distinction. Here, the appellants had no more control over the erection of the dike and subsequent accretion than they would have had if the accretion had occurred naturally. To interpret the Act as to penalize them simply because the cause of the accretion, which was beyond their control, was an artificial rather than a natural one would produce a result that is unfair and unreasonable. We choose to avoid such an untenable result,[13] *see State v. Intercontinental, Ltd.*, 302 Md. 132, 486 A.2d 174 (1985); *Bailey v. Woel*, 302 Md. 38, 485 A.2d 265 (1984), and therefore hold that it is immaterial whether the land in question resulted from artificial or natural accretion.

(2)

*The Riparian "Right of Access"*

One of the greatest assets of being riparian is the right of access to navigable water. *See Bonelli Cattle Co. v. Arizona, supra*, 414 U.S. at 326, 94 S.Ct. at 526 ("the quality of

---

**13.** The Wetlands Act, at Md.Nat.Res.Code Ann. § 9–201(a), provides that a riparian owner is "entitled to any natural accretion to his land...." The inclusive words "or otherwise" are conspicuously absent. As the language in the Act of 1862 had heretofore never been considered on the issue of its application to artificial accretions, it is unclear whether the legislature now intends to disentitle riparian owners of artificially accreted lands.

being riparian, especially to navigable water, may be the land's most valuable feature"); *Steinem v. Romney,* 233 Md. 16, 23, 194 A.2d 774 (1963); *Waring v. Stinchcomb,* 141 Md. 569, 119 A. 336 (1922). In *Waring, supra* at 582, 119 A. 336, the Court of Appeals quoted with approval from *Lamprey v. Metcalf,* 52 Minn. 181, 53 N.W. 1139 (1893), wherein the Supreme Court of Minnesota discussed the reason for the common law rule vesting accretions and relictions in the riparian owner:

> "The reasons usually given for the rule are either that it falls within the maxim *de minimis lex non curat,* or that, because the riparian owner is liable to lose soil by the action or encroachment of the water, he should also have the benefit of any land gained by the same action. But it seems to us that the rule rests upon a much broader principle, and has a much more important purpose in view, viz: *to preserve the fundamental riparian right*—on which all others depend, and which often constitutes the principal value of the land—*of access to the water.* The incalculable mischiefs that would follow if a riparian owner is liable to be cut off from access to the water, and *another owner sandwiched in between him and it, whenever the water line had been changed by accretions or relictions, are self evident, and have been frequently animadverted on by the courts.*"

(Emphasis supplied in part).

At this juncture, it is important to note that the emphasis is not on having mere *actual access* to water—*i.e.,* the practical ability to reach the water; rather, it is on preserving for the riparian owner the *right of access* to the water—the legal right to use, improve and build out from the land that borders on the water. *See Hughes v. Washington,* 389 U.S. 290, 293, 88 S.Ct. 438, 440, 19 L.Ed.2d 530 (1967); *Owen v. Hubbard,* 260 Md. 146, 155–57, 271 A.2d 672 (1970); *Causey v. Gray,* 250 Md. 380, 386–89, 243 A.2d 575 (1967); *Steinhem v. Romney,* 233 Md. 16, 194 A.2d 774 (1963); *Waring v. Stinchcomb,* 141 Md. 569, 119 A. 336 (1922). *Cf. Melvin v. Schlessinger,* 138 Md. 337, 340,

113 A. 875 (1921) (prior to Act of 1862, riparian owners had no right to make improvements into the water bounding on their property). *See generally United States v. 1,629.6 Acres of Land,* 335 F.Supp. 255 (D.Del.1971), *Supp. Op.,* 360 F.Supp. 147 (1973), and cases cited therein. The distinction between actual access and the legal right of access is admittedly a fine one, but in order for the rights of adjoining landowners to be properly adjudicated, it is a distinction that must be clearly understood.

In each of the cases that are discussed *infra,* contiguous riparian landowners were claiming the right to enter and possess accretions or improvements which lay before their property. The issue of actual access to the water, and the extent to which the accretion or improvement made that "ability to reach the water" more difficult, was never raised in these cases.

In *Waring v. Stinchcomb,* 141 Md. 569, 119 A. 336, two adjoining landowners contested title to a large accreted sand bar which had closed the original outlet of the Little Magothy River. The effect of this accretion was to exclude from the Chesapeake Bay and the Magothy River a large portion (but not all) of the Stinchcombs' property to the extent that it made that portion of their property an inland farm, and to cause their property to depreciate greatly in value. The Stinchcombs were essentially seeking to enjoin the Warings, appellants, from removing a divisional fence the Stinchcombs had erected on the sandbar to delineate their property ownership.

The appellants denied the Stinchcombs' allegations of land value depreciation, and alleged that, because "the [accreted sandbar] is exclusively on the [Warings'] side of Little Magothy River and nowhere touches the [Stinchcombs'] land, it being separated therefrom by said creek," it cannot be the property of the Stinchcombs. 141 Md. at 574–75, 581–82, 119 A. 336. The court rejected this "separation" argument stating "[t]his should not be, and we think is not, the law applicable to the rights of riparian

owners." *Id.* at 582, 119 A. 336. Notwithstanding that the Stinchcombs actually had access to the waters of the Magothy River and had three-quarters of a mile frontage on the Chesapeake Bay, the court, citing the language in *Lamprey v. Metcalf, supra,* stated:

> To hold that the land involved in this case belonged to the appellants would entirely exclude the appellees from the bay, *at least to the extent the land has formed off their shore, and would deprive them of their riparian rights in respect thereto.*
>
> It would sandwich the appellants between them and the bay, and would not only be in conflict with the rule above laid down, which is generally accepted by the courts of this country ..., but *it would deprive the appellees of the right given them by statute to build out in the water in front of their land.*

*Waring,* 141 Md. at 582, 119 A. 336 (emphasis added) (citations omitted).

This language in *Waring* was controlling in *Steinem v. Romney,* 233 Md. 16, 194 A.2d 774 (1963). In *Steinem,* the issue once more was the ownership of an accreted sandbar in the Patuxent River that was attached to one riparian owner's land (Steinem's) yet extended laterally so as to lie directly in front of an adjoining riparian owner's land (Romney's) similar to the relative situation between the Raynes and the Coulbournes *sub judice.* The *Steinem* court noted that, if not for the deflection of Big Kingston Creek, which had divided the parties' property prior to the formation of the sandbar, the sandbar in question "would have been physically joined, above water, to the foot of [Romney's] embankment." *Id.* at 22, 194 A.2d 774.

This judicial notice is illustrative of the holding in *Waring,* that it is immaterial whether the accretion is separated by navigable water; the essential factor is whether the accretion formed in front of the riparian owner's land. The importance of this factor was evidenced in *Owen v. Hubbard,* 260 Md. 146, 271 A.2d 672 (1970), where two adjoining

property owners contested ownership of part of a bulkhead that had been erected by Owen, but which extended out into the water in front of the Hubbards' property. The Court of Appeals affirmed a lower court's ruling that the Hubbards "had title to that part of the bulkhead which was *in front of their property." Id.* at 150, 271 A.2d 672. The dispute centered on that part of § 46 of Art. 54, which conferred upon the riparian proprietor the exclusive right to make improvements in front of his land, and required the court to construe the words "in front of." [14] Never was the issue of ease of access raised nor discussed.

Two years later, in *Williams v. Skyline Development Corp.,* 265 Md. 130, 288 A.2d 333 (1972), the court addressed the issue whether this exclusive right to make improvements into the water was a severable right. In *Williams,* shortly after the appellant had purchased condominium units, which at the time of purchase had fronted on the open bay in Ocean City, Maryland, the developer-appellee, by dredging, filling and bulkheading, extended adjoining property owned by him in such a way that an artificial island was created in front of the condominiums. This eliminated appellant's view of the open bay and left appellant fronting only on a lagoon. The court held that, because the developer had specifically retained ownership of the riparian rights appurtenant to the condominium property, he had properly severed this right to make improvements into the water. Again, although the appellant's ease of access to the open bay was greatly diminished, the issue of actual access was never raised.

The emphasis in all these cases, as in the majority of cases involving accreted land that forms in front of but does not touch a riparian owner's property, *see Annotation,* 61 A.L.R.3d 1173 (1975), is the *quasi-property* right to

---

14. The *Owen* court held that "in front of" is synonymous with "land *bounding* on any navigable waters of the State" and that these phrases "only denote that any property bounding on navigable waters ..., whether it be by the front, side, or back line, has riparian rights." *Owen v. Hubbard,* 260 Md. at 158, 271 A.2d 672 (emphasis in original).

extend his property, whether by accretion—as he could do at common law, or by making improvements into the water—an enhanced right under the Act of 1862. Most instructive perhaps is Judge Barnes's statement in *Causey v. Gray*, 250 Md. 380, 387, 243 A.2d 575 (1968), quoted with approval in *Owen v. Hubbard*, 260 Md. at 156, 271 A.2d 672:

> The owner of the fast land, however, has a common law right to land formed by accretion adjacent to the fast land and has the right of access to the navigable part of the river in front of his fast land, with the right to make a landing, wharf or pier in front of his fast land, subject, however, to general rules and regulations imposed by the public authorities necessary to protect the rights of the public. When the statutory law grants the right to a riparian owner to extend his lot or to improve out to the limits prescribed by the public authorities, the riparian owner receives a "franchise—*a vested right, peculiar in its nature but a quasi-property of which the lot owner cannot be lawfully deprived without his consent." B. & O. R.R. Co. v. Chase*, 43 Md. at 36–37.

(Emphasis added).

In its opinion, the trial court correctly recognized this as being the applicable rule in cases where the accretion formed was natural. As we have discussed, *supra*, this rule should also be applied to cases involving artificial accretion. In addition, however, the trial court placed great emphasis on the fact that the Raynes had not shown their actual access to navigable water had been adversely affected by the Coulbournes' possession of the peninsula.[15]

---

**15.** Implicit in the trial court's finding of access is that the fifty foot area, between appellants' fastland and the accreted peninsula, is "navigable" because the tide there ebbs and flows. The record indicates that during high tide the water in this area is two to three feet deep, and that at low tide it consists mainly of mud flats except for a two foot-wide stream. Whether the area is in fact navigable is an issue collateral to this appeal which we need not address. However, the definition in *Wagner v. City of Baltimore*, 210 Md. 615, 124 A.2d 815 (1956), seems to support the trial court's finding of navigability. *See Owen v. Hubbard*, 260 Md. 146, 152 and n. 1, 271 A.2d 672 (1970).

As we have explained, the emphasis on actual access is misplaced. We are not suggesting that the ability to reach navigable water is an unimportant factor of riparian ownership. Indeed, we recognize the basic rationale for giving the rights to accretion or reliction to the riparian owner "was to assure ... that he would never be cut off from his access to water." *Board of Public Works v. Larmar*, 262 Md. at 36, 277 A.2d 427. Access to water was crucial as navigable water was the major thoroughfare of the times. *Harbor Island Marina, Inc. v. Board of County Comm'rs*, 286 Md. 303, 407 A.2d 738 (1979). This importance of the ability to reach and use the water for transportation is also implicit in the language of the Act of 1862, which gave riparian owners the right of making improvements into the waters fronting their land, but expressly limited this right so that

> no such improvement shall be so made as to interfere with the navigation of the stream of water into which the said improvement is made.

Md.Code Ann. Art. 54 § 46 (repealed). Nevertheless, the fact that the Raynes may or may not have had actual access to navigable water is not controlling in this case.

■ The controlling test to be applied in cases where accretions, whether they be natural or artificial, form in front of a riparian owner's land is whether the legal "right of access" to that body of water—as it existed in its original state without the impact of the accretions—has been preserved. While this right may be severed by the riparian owner, *Williams v. Skyline Development Corp., supra,* once vested, it cannot then be divested from him by another—the State or a contiguous riparian owner—without his consent. *Causey v. Gray*, 250 Md. at 387, 243 A.2d 575, quoting *B. & O. R.R. v. Chase*, 43 Md. 23 (1875).

■ In the instant case, a portion of the peninsula formed in front of the Raynes' riparian property. In order to preserve their right of access to the Wicomico River as it existed prior to the formation of the peninsula, the Raynes

are by law vested with ownership of a certain portion of the peninsula. The trial court's holding, therefore, was erroneous.

As the peninsula passes in front of other riparian parcels in addition to the Raynes' lot, the trial court shall apportion the peninsula in accordance with the equitable principles enunciated in *Causey v. Gray*, 250 Md. 380, 389–90, 243 A.2d 575. For this purpose, it may be necessary to rejoin those parties that have abandoned these proceedings.

JUDGMENT REVERSED AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE DIVIDED BETWEEN THE PARTIES.